GEORGINA PRIETO, por sí y como madre con patria potestad de sus hijos GEORGINA MARÍA, CELIA MARÍA, HÉCTOR y JOSÉ RAMÓN PIÑERO PRIETO, demandantes y recurrentes, *v.* MARYLAND CASUALTY CO. y EDWIN V. GOSS, demandados y terceros demandantes-recurridos, *v.* TRANSPORTE METROPOLITANO, INC. y UNITED STATES CASUALTY, CO., terceros demandados-recurridos.

*Número:* R-515          *Resuelto:* 12 de febrero de 1970

*Félix Ochoteco, Jr.,* abogado de los recurrentes; *Rivera Zayas, Rivera Cestero & Rúa,* abogados de los recurridos; *Luis E. García Benítez,* abogado de Transporte Metropolitano, Inc., y *Emilio de Aldrey,* abogado de United States Casualty Company.

EL JUEZ ASOCIADO SEÑOR HERNÁNDEZ MATOS emitió la opinión del Tribunal.

Revisamos la sentencia final del Tribunal Superior, Sala de San Juan, que declaró sin lugar una reclamación de daños y perjuicios incoada por Georgina Prieto, viuda de Piñero, por sí y como representante legal de sus menores hijos Georgina María, Celia María, Héctor y José Ramón Piñero Prieto, contra Edwin V. Goss y la aseguradora Maryland Casualty Co.

La Sala sentenciadora en su relación del caso y determinaciones de hecho describió el accidente que causó la muerte del ingeniero Héctor Piñero y el subsiguiente litigio instando por sus herederos, en la siguiente forma:

*"Relación del Caso, Determinaciones de Hecho y Conclusiones de Derecho*

El caso de epígrafe fue radicado por doña Georgina Prieto viuda de don Héctor Piñero y los hijos de ambos nombrados, Georgina María, Celia María, Héctor y José Ramón Piñero Prieto, en reclamación de daños y perjuicios por la muerte de su esposo contra don Edwin V. Goss y la Maryland Casualty Co., alegando, en síntesis: que una pala mecánica, propiedad del demandado y asegurada por la otra codemandada contra daños a terceros, por tener aquella un desperfecto en el mecanismo de sus frenos que manipulaban el cucharón causó la muerte del causante de los demandantes al caerle sobre su cuerpo las puntas

de los dientes del referido cucharón, reclamándole a los demandados $100,000.00 por concepto de los daños y perjuicios que la citada muerte le causó a los demandantes.

Los demandados radicaron una contestación conjunta negando toda la responsabilidad en el mencionado accidente y radicaron una demanda de tercero contra la corporación Transporte Metropolitano, Inc., y su aseguradora la U.S. Casualty Co., alegando que la responsable de dicha muerte lo fue Transporte Metropolitano, Inc., la que había sido contratada para la transportación de la aludida pala mecánica que había arrendado a su vez el Sr. Héctor A. Piñero al demandado Edwin V. Goss, alegándose que la muerte del causante fue la culpa y negligencia de la tercera demandada por razón de la forma descuidada en que realizó la transportación.

Los terceros demandados contestaron la demanda de terceros negando toda la responsabilidad en el citado accidente.

.    .    .    .    .    .    .    .

### Determinaciones de Hecho

Que don Héctor A. Piñero, Ingeniero Civil, arrendó del demandado Sr. Edwin Goss, una pala mecánica para ser utilizada en la extracción de arena en el proyecto de la carretera del desvío Loíza, cuya obra estaba realizando el Sr. Piñero como tal ingeniero mediante subasta pública.

Que a los fines de que la citada pala pudiera realizar el trabajo para lo cual fue arrendada hubo que cambiarle el aditamento con el cual estaba siendo usada por la P.R. Aggregates, llamado el mismo 'front-shag' o 'drag-line', sustitución esta que se realizó por empleados del demandado Edwin V. Goss.

Que debido a que el ingeniero Héctor A. Piñero tenía suma prisa en usar dicha pala mecánica, llamó a las oficinas de Transporte Metropolitano, Inc., para que transportaran dicha pala al sitio en donde iba a usarse, entregando los empleados del demandado Sr. Goss la citada pala a un 'trailer' o vehículo pesado de motor para su conducción hasta el sitio del proyecto, siendo dicho vehículo propiedad de la tercera demandada, Transporte Metropolitano, Inc.

Que cuando la pala fue entregada a dicha porteadora para su transportación por cuenta de su arrendatario, ésta había sido examinada antes por el Sr. Goss personalmente, aunque no

realizó la inspección del cambio de aditamento hecho por sus empleados.

Que dicha pala iba a ser funcionada por el Sr. Clotilde Santos Ortiz, operador del Sr. Goss, aunque su salario como tal operador iba a ser pagado por el Sr. Piñero, quedando desde ese momento bajo sus órdenes.

Que la pala con su aditamento fue puesta en el 'trailer' antes citado sobre la plataforma del mismo y mientras dicho 'trailer' transcurría tirado por su correspondiente arrastre por la carretera que conduce al barrio San Isidro de Canóvanas para el sitio del proyecto, a eso de la 1:45 de la tarde del día 2 de noviembre de 1955, se atascó el remolque del 'trailer' y el Sr. Héctor A. Piñero ordenó a uno de sus empleados que fuera a buscar una razadora ('bulldozer') de su pertenencia para que sacaran el arrastre del 'trailer' de su atolladero, no habiendo sufrido atascamiento alguno el 'trailer'.

Que cuando se estaba acercando el tractor 'bulldozer' (razadora) al sitio donde estaba el 'trailer' atascado, el Sr. Héctor A. Piñero mandó a Clotilde Santos Ortiz, como operador de la pala, a que subiera al puntal ('boom') con el cucharón del mismo para que al tractor 'bulldozer' (razadora) se le facilitara el poder sacar del atascamiento el remolque del 'trailer'.

Que dicho Clotilde Santos Ortiz fue a su vez el operador y empleado del Sr. Goss que realizó el cambio del aditamento en la referida pala mecánica antes de ser entregada al Sr. Piñero.

Que dicho Clotilde Santos Ortiz se subió a la pala introduciéndose en la cabina de la misma, hizo funcionar la máquina de éste, subiendo el brazo de la pala ('boom') con su cucharón, dejándolo así elevado en suspenso y volviendo a apagar la máquina, saliendo de la cabina y permaneciendo de pie en una escalerilla que tenía la pala en la mitada de su brazo o puntal, luego de haber ajustado un cable de la misma que nada tenía que ver con dicho brazo.

Que el señor Piñero, quien estaba a corta distancia de la pala mecánica hablando con uno de sus empleados, dio una vuelta y sacando una caja de cigarrillos de su bolsillo se llevó uno a la boca mientras caminaba en dirección al 'trailer'. Se paró debajo de la pala para encender el mismo y fue entonces cuando el brazo o puntal de la misma descendió con el cucharón alcanzando las puntas de los dientes izquierdos de éste último al señor Piñero

por el lado izquierdo de su cuerpo cayendo al pavimento y quedando pillado por el cucharón hasta que el propio Clotilde Santos Ortiz, quien no se había dado cuenta del accidente, al llamársele la atención de la ocurrencia del mismo y habiendo recibido órdenes al efecto del propio Sr. Piñero, penetró en el acto en la cabina de la pala y haciendo funcionar su máquina alzó el puntal y el cucharón quedando en esa forma liberado el Sr. Piñero del peso del mismo.

Que así herido condujeron al Sr. Piñero a una clínica en Canóvanas, donde le prestaron la primera asistencia médica y luego fue trasladado al Hospital Auxilio Mutuo de Río Piedras, donde falleció dos días después como consecuencia de las lesiones recibidas en el citado accidente."

Dicha Sala llegó a la conclusión principal de que "no se ha probado que la causa próxima, única y eficiente del accidente fuese la negligencia del demandado, Sr. Goss, sus empleados o agentes, a base de las siguientes determinaciones de hechos:

Que la pala mecánica, a que se ha hecho referencia anteriormente, es una marca North-West adquirida por el demandado, Sr. Goss, en el año 1942 en una subasta del War Surplus Supply de la Marina de los Estados Unidos de América en Vieques. Estas palas mecánicas tienen una vida de 40 a 50 años. Que desde el tiempo en que el Sr. Goss la adquirió siempre la ha dedicado a arrendarla y tenía para la fecha del accidente como 17 años de fabricada. Que esta máquina tiene dos pedales, el pedal derecho aguanta el puntal o 'boom' y el cucharón en el aire llevándola a voluntad donde uno quiera y el izquierdo es para fijar el cucharón en el aire. Cuando se está trabajando la uña o pieza de fijar el cucharón en el aire no trabaja, razón por la cual dura más tiempo. La uña en este pedal izquierdo constituye un engrape (latch) para asegurar el pedal que ajusta el freno que aguanta el brazo de la pala con el cucharón en suspenso. Esta uña tenía un desgaste de un 10% más o menos, pudiendo tener de 20 a 30% de desgaste antes de ser peligrosa. El plano inferior de la otra pieza donde aguanta la uña tenía un desgaste de 1/16 avos de pulgada y cualquiera de las dos piezas que tuviera un 40% de desgaste podría causar que el agarre fallara. Se necesita de un desgaste exagerado en ambas piezas para no aguantar.

Mientras haya contacto en ellas hasta de 1/8 de pulgada tiene suficiente fuerza para agarrar. No es usual el permitir que el brazo y el cucharón permanezcan por mucho rato arriba, aunque si la condición es ideal puede permanecer así para siempre. Tiene que suceder algo anormal para que se caiga. El desgaste de la uña tenía suficiente agarre para trabajar, era un desgaste tolerable y sin ningún agente extraño no era suficiente para hacer caer la pala.

Que allá para el 7 de noviembre de 1955, o sea 5 días después de haber ocurrido el accidente sin aún haberse puesto la pala mecánica a trabajar luego de la ocurrencia del mismo, y en el mismo proyecto antes mencionado, a petición del Sr. Emilio Piñero (Millín), quien decía la uña tenía un desgaste y que no permitiría que se trabajase con la misma a menos que se le diera una soldadura, Clotilde Santos Ortiz soldó la uña dándole un punto con vista a corregirle el desgaste alegado, soldadura ésta que luego tuvo que ser removida con un cortafrío porque no permitía trabajar a la pala, ya que a cada momento se encajaba el pedal. Después de removido el punto o soldadura, la máquina siguió trabajando normalmente como antes lo hacía.

Que después del accidente al Sr. Héctor A. Piñero, se encontró sobre el suelo de la máquina, cerca del pedal, un lingote en forma de 'T' o martillo como de más o menos dos pies de largo por una pulgada de grueso que pertenecía a las herramientas de la pala.

Que cualquier presión que se haga sobre el pedal y lo baje es susceptible de soltar la uña que engrapa o asegura el freno que aguanta el brazo de la pala en suspenso.

Que cinco (5) días después de haber ocurrido el accidente, sin haberse puesto la citada pala mecánica a trabajar, luego de la ocurrencia del mismo y en el propio proyecto antes mencionado, varias personas con conocimiento de equipo pesado, a requerimiento de don Emilio Piñero, padre del señor Héctor A. Piñero, examinaron el mecanismo de la pala en cuanto a su funcionamiento encontrando desgaste en la uña o agarre que permitía al cucharón quedarse en suspenso.

Que el brazo del cucharón vino en suspenso desde el sitio en que montaron la pala en el 'trailer' hasta el momento en que se atascó y por el camino le penetraron hojas, residuos de ramas de árboles y ganchos en el mecanismo de los frenos mientras era

transportada por la tercera demandada Transporte Metropolitano, Inc.

Que hay muchos factores por los cuales puede caerse el brazo de una pala, entre ellos: mucha grasa en la uña, materia extraña que impida su agarre, estar la misma en posición fuera de ajuste, por desgaste suficiente, por vibración si la uña no está debidamente engrapada, etc."

Los recurrentes imputan en su alegato la comisión de los siguientes errores:

"*PRIMERO*: Erró el Tribunal a quo al resolver que no se había probado que la 'causa próxima, única y eficiente del accidente' fuese la negligencia del demandado, Sr. Goss, sus agentes o empleados, no obstante haberse probado los siguientes hechos:

1.—Que luego que a la citada pala mecánica los empleados del demandado-recurrido Sr. Goss le cambiaron el aditamento llamado 'front-shag' o 'drag-line', por instrucciones de dicho demandado, y con vista de que ella sirviera a los fines para los cuales fue arrendada por el causante de los demandantes, al entregar los aludidos empleados la mencionada pala para ser transportada al proyecto de dicho señor Héctor A. Piñero, no fue examinada previamente a dicha entrega por los operarios que realizaron el citado cambio, ni la cabina de la mencionada pala, a los fines de cerciorarse que en la misma no había quedado instrumento o cuerpo alguno capaz de producir un inesperado e improcedente despegue del mecanismo de los frenos de la referida pala.

2.—Que el día del accidente, e inmediatamente minutos después de la ocurrencia del mismo, al hacer el operador de dicha pala mecánica, Clotilde Santos, persona seleccionada para tal labor por el propio codemandado-recurrido, Sr. Goss, y el mecánico que a su vez realizó el trabajo de dicho cambio de aditamento en la pala en cuestión, una inspección de su cabina, se encontró sobre el suelo de dicha cabina un lingote en forma de 'T' o martillo como de más o menos dos pies de largo por una pulgada de grueso que era una de las herramientas que se habían usado para el referido cambio de aditamento, y que por razón de no haberse inspeccionado dicha cabina con anterioridad a haber sido entregada la pala para su conducción en un trailer de la tercera-demandada Transporte Metropolitano, Inc., habiendo sido

capaz la citada herramienta de haber producido su caída sobre uno de los pedales de la pala, que la uña de agarre de los frenos se desprendiera y causara el inesperado descenso del brazo de la pala, conforme opinión del propio mecánico antes dicho, quien manifestó que conforme a su criterio, tal caída de dicha herramienta, y no otra causa, fue lo que produjo el ya expresado accidente.

3.—Que cinco días después de haber acontecido el mencionado accidente, y antes que la pala mecánica de referencia volviera a trabajar, y en el propio proyecto antes mencionado, según se expresa en las Determinaciones de Hecho del Tribunal a quo, dicha pala mecánica fue sometida a inspección por peritos en equipo pesado, a requerimiento del padre de don Héctor A. Piñero, y no solamente encontraron desgaste en la uña o agarre de los frenos que permite que el cucharón quede en suspenso, sino algo más fundamental que no dicen las citadas Determinaciones de Hechos, o sea, que manipulada allí entonces la expresada pala en diferentes ocasiones sus frenos no respondieron en su mecanismo de agarre, no pudiendo la pala mecánica mantener en suspenso el cucharón de la misma, por lo que, los peritos concluyeron que los frenos de la pala estaban defectuosos en el momento del accidente.

4.—Que los peritos de referencia no encontraron residuos de ramas u hojas o cualquier otro cuerpo extraño en el mecanismo de los frenos, y específicamente en la uña de dicha pala mecánica, y lo que es aun más concluyente sobre dicho extremo, que el propio mecánico de la pala en cuestión inmediatamente después del accidente examinó la uña de referencia y no halló residuo alguno de los antes dichos en el mecanismo de los frenos del citado artefacto.

5.—Que la citada pala había estado expuesta a tener un accidente idéntico al ocurrido a don Héctor A. Piñero, mientras trabajaba hacía sólo unos meses en un proyecto en Guayanilla, P.R., al fallarle sus frenos, habiendo corrido el riesgo de ser alcanzado por aquélla el auxiliar del operador de la misma, habiendo sido en el referido proyecto en que últimamente había estado trabajando la aludida pala mecánica inmediatamente antes de ser transportada a trabajar en el proyecto del señor Héctor A. Piñero.

6.—Que el entonces operador de dicha pala, seleccionado por el codemandado y recurrido señor Goss, en el momento en que tuvo lugar el citado fallo de frenos en dicha pala en cuestión, se lo hizo saber al señor Goss, quien aplazó la reparación de dichos frenos para cuando dispusiera de tiempo, por lo que la misma en lo sucesivo su operador la trabajaba no dejando el cucharón en suspenso y sí sobre el suelo, por temor a que los frenos fueran a fallar causando el inesperado descenso del brazo de la pala con su cucharón.

*SEGUNDO*: Erró el Tribunal a quo al resolver, que por razón a que pueden ser muchos los factores que pueden causar una falla en los frenos de una pala mecánica, los demandantes-recurrentes dejaron de probar que la causa próxima, única y eficiente del accidente fuese la negligencia de dicho codemandado recurrido, señor Goss, y todo ello no obstante haberse probado los hechos anteriormente relacionados que establecen la negligencia del citado dueño de la mencionada pala mecánica.

*TERCERO*: Porque si bien es cierto que las distintas causas mencionadas por el Tribunal a quo en sus Determinaciones de Hechos pueden causar una falla en el mecanismo de los frenos de una pala mecánica, no es menos cierto, que en el caso de epígrafe, se demostró que ninguna de las mencionadas causas pudo haber originado tal accidente, ya que, consideradas éstas por el orden especificado por el Tribunal a quo:

1.—*Mucha grasa en la uña.*—No hubo prueba de ello, y en el supuesto de que la hubiera habido, tal exceso de grasa hubiera sido por negligencia del demandado recurrido y/o sus empleados, que fueron los que engrasaron la pala antes de su entrega al arrendatario y antes de que éste la pusiera a trabajar.

2.—*Materia extraña que impida su agarre.*—El mecánico seleccionado por el dueño de la pala, al examinar ésta inmediatamente después del accidente, encontró que no existían cuerpos extraños en el mecanismo de los frenos, tales como hojas y residuos, de ganchos, etc.

3.—*Estar la pala en posición fuera de ajuste.*—Hubo ausencia de prueba sobre este extremo, y en el supuesto que la hubiera habido, tal deficiencia hubiera existido por negligencia del dueño de la pala al no mantener el mecanismo de la misma en la debida forma de conservación.

4.—*Por desgaste suficiente.*—De haber sido ésa la causa, la negligencia causante del accidente hubiera sido únicamente imputable al dueño de la pala por haber arrendado la misma al causante de los demandantes-recurrentes en estado defectuoso y peligroso.

5.—*Por vibración si la uña no está debidamente engrapada.*—No hubo prueba alguna sobre tal extremo, y por el contrario, el mecánico de la pala declaró que cuando dejó el cucharón en suspenso, introdujo los frenos debidamente.

*CUARTO:* Erró el Tribunal a quo al no aplicar la regla en la acción de epígrafe de que la negligencia puede ser inferida en circunstancias propiamente aducidas en evidencia, como aconteció en el presente caso conforme lo revela la prueba practicada, circunstancias éstas que levantaron la razonable presunción de la negligencia en que incurrió el demandado-recurrido, demostrando los propios hechos que prueban el accidente, y dan base a dichas circunstancias, la presencia de negligencia por parte del dueño de la pala mecánica en cuestión.

*QUINTO:* Erró el Tribunal a quo, dada la naturaleza de la prueba aportada en la acción que motiva el recurso de epígrafe, al no aplicar la regla de que no se requiere que un demandante en una acción de daños y perjuicios establezca con toda certeza que la causa próxima, única y eficiente de un accidente tenga que establecerse con toda certeza, bastando con que la prueba, conforme acontece en el caso que ocupa nuestra atención, demuestre que de varias posibles causas demostradas por la evidencia, hay una que ofrece mayor fundamento para concluir que es la más probable para sostener la negligencia del demandado.

*SEXTO:* Erró el Tribunal a quo, dada la naturaleza de las relaciones existentes de arrendador y arrendatario entre el codemandado-recurrido, señor Goss, y el causante de los comparecientes, Sr. Héctor A. Piñero, y conforme a la prueba practicada, al aplicar los siguientes principios con vista a establecer y evaluar la negligencia de dicho arrendador:

A.—Que a todo arrendador de una cosa que constituye una que comprende en su operación un artefacto mecánico, la ley le impone a él la obligación de hacer entrega de la misma a arrendatario con el mecanismo en cuestión apto para funciona; conforme a los fines para los cuales la cosa fue arrendada.

B.—Que todo arrendador viene obligado a indemnizar los daños y perjuicios que le ocasione a un tercero, incluyendo al arrendatario, la cosa dada por él en arrendamiento por razón de un defecto de la misma del que tuvo conocimiento el arrendador, o sin que tenga conocimiento, pudo haberle tenido si hubiera usado la debida diligencia.

C.—Que todo arrendatario tiene derecho a presumir que la cosa arrendada al recibirla del arrendador se encuentra en condiciones de servir para el fin para el cual fue arrendada y que se encuentra libre de defectos en su mecanismo que ponga en riesgo la seguridad o vida de las personas que se pondrán en contacto con la misma.

D.—Que todo arrendador de una cosa es un asegurador del arrendatario y de terceras personas que sufran daños y perjuicios como consecuencia de defectos en el mecanismo de la cosa arrendada, si tal defecto era de conocimiento del arrendador o pudo enterarse del mismo de haber ejercitado la debida diligencia.

*SEPTIMO*: Porque erró el Tribunal a quo, no precisamente en la apreciación de la prueba practicada en el juicio del caso que motiva el presente recurso, y sí cometió error grave en el aquilatamiento de la efectividad y alcance legal a la referida prueba, y específicamente en lo pertinente a los extremos de la misma a que se contraen los anteriores tres primeros Fundamentos de Revisión.

*OCTAVO*: Porque no obstante haber declarado probados el Tribunal a quo hechos intermedios que de por sí demuestran que el demandado-recurrido, señor Goss y/o sus empleados, incurrieron en negligencia, encontrándose entre tales hechos la mayoría de los anteriormente relacionados, erró el Tribunal a quo al concluir como hecho definitivo que no incurrió en negligencia alguna el dueño de dicha pala en relación con el accidente antes referido, por lo que, no viene obligado este Hon. Tribunal Supremo a sostener como correcto el citado hecho definitivo sobre ausencia de negligencia.

*NOVENO*: Porque el Tribunal a quo erró al hacer suyas las conclusiones de los peritos del demandado-recurrido, señor Goss, en cuanto a que, no obstante reconocer que tenía desgaste, la uña de la pala, tal desgaste, por ser uno que según ellos sólo era del 10%, y no excedía por tanto del 30%, no era suficiente para

haber producido el fallo en el mecanismo de los frenos de la pala en los momentos del accidente de marra, y todo ello no obstante; (1) la ocurrencia de los hechos de por sí demostraban la equivocación de los peritos; (2) porque las opiniones de los peritos están en conflicto con la evidencia practicada; y (3) por no venir obligado este Hon. Tribunal Supremo por las conclusiones de dichos peritos, ni por el valor probatorio que a sus testimonios le dio el Tribunal a quo, desde el momento de que tales opiniones de los referidos peritos no fueron la única prueba aportada sobre el efecto del desgaste en la mencionada uña de los frenos en la ocurrencia del accidente.

DECIMO: Erró el Tribunal a quo, y como secuela de haber declarado sin lugar la demanda, de no haberle impuesto las costas y honorarios de abogados a los demandados-recurridos, Sr. Edwin V. Goss y Maryland Casualty Company, por lo que, los comparecientes solicitan de este Hon. Tribunal Supremo, que al revocar la sentencia, y dictar otra declarando con lugar la demanda, le imponga a los mismos las costas y el pago de honorarios de abogados."

Hemos analizado detenidamente la extensa prueba aportada en juicio, que es, mayormente, pericial. Consideramos el verdadero valor probatorio y el más correcto efecto legal que a cada testimonio o pieza de evidencia se debía atribuir, o que en justicia debía merecer, en una búsqueda del balance más racional, justiciero y jurídico que la totalidad de esa prueba representaba. Como una inescapable conclusión de toda esa labor resolvemos que la sentencia objeto del presente recurso debe revocarse, porque las conclusiones de hecho a que aquí arriba la Sala sentenciadora en forma alguna representan tal balance.

La índole de los apuntamientos indicados nos obliga a hacer, por lo menos en su parte esencial, un resumen de la prueba oral aducida por las partes.

*CLOTILDE SANTOS ORTIZ*, operador de la máquina, declaró como testigo de los demandantes y como testigo de los demandados.

En esencia señaló que lleva como 13 ó 14 años trabajando en equipo pesado, que puede desmontar y montar cualquier pala sin necesidad de plano alguno. (T.E. pieza I pág. 150.) Que había trabajado en varias ocasiones con la pala causante del accidente. Que él siempre trabajaba con el patrono que alquila la misma. (T.E. I pág. 150.) Que había trabajado por espacio de cerca de dos años con esa pala. (T.E. I pág. 152.) Que conoce esa pala desde 1942 cuando estaba en Vieques. Que el accidente se debió a que una barra como de 28 pulgadas se había quedado dentro de la cabina de la máquina cuando se estaba llevando a cabo la sustitución del sistema a *dragline* y que él cree que esa barra cayó sobre el pedal del freno desenganchando la uña que sostenía el puntal en alto. (T.E. I pág. 154.) Que debido a que el *trailer* que iba a transportar la pala llegó demasiado temprano no les dio oportunidad de recoger todas las piezas o herramientas que se usan para reparar la máquina quedando unas hasta mal puestas dentro de la cabina. (T.E. I pág. 155.) Que esa sustitución se hizo mientras la pala estaba en poder de Sr. Goss. (T.E. I pág. 154.) Que debido a la prisa no se revisó o supervisó la pala antes de salir del taller, que "según estaba todo así quedó." Que de acuerdo con su criterio fue esa barra la que ocasionó el accidente. (T.E. I pág. 157.) Que él siempre trabaja en esa pala pero quien la paga es el que la alquila. (T.E. I pág. 159.) Que la uña que mantenía el puntal en suspenso tenía su desgaste pero que él cree que no fue esa la causa del accidente. (T.E. I pág. 162.) Que lo que se le hizo a la pala fue un cambio o sustitución del sistema no una reparación. (T.E. IV pág. 60.) Que los encargados de la transportación llegaron más o menos después de las *siete de la mañana* a recoger la pala. (T.E. IV pág. 61.)

Que siempre en el transporte de una máquina de esa naturaleza durante el recorrido caen dentro de ella pedazos de ganchos, hojas de almendras y todo lo que tropieza en el camino (T.E. IV pág. 71) pero que el día del accidente no

encontró hojas, ganchos o material extraño alguno cerca del pedal del freno. (T.E. IV pág. 109.) Que la sustitución o cambio al sistema de *dragline* se hizo por cuenta de Sr. Goss. (T.E. IV págs. 114 y 116.)

Que como cinco días después del accidente fueron varios peritos a examinar la pala, que la trastearon, que bregaron con el pedal, pero nunca echaron a caminar la máquina, que no hicieron funcionar el puntal y cuchareta que sólo bregaron con el pedal. (T.E. IV pág. 123.) Que los peritos achacaron el accidente al desgaste de la uña que aguanta el puntal en suspenso pero que él no participaba de ese criterio. (T.E. IV pág. 131.)

Como testigo de los demandados Clotilde Santos reiteró casi todo lo que había testificado como testigo de los demandantes. Reiteró que ni John Grazel, ni ningún otro perito echó a funcionar la máquina mientras él estuvo allí, el día que fueron a examinarla. (T.E. VI pág. 139.) Que no encontró ni en los frenos ni en la uña, hoja o rama alguna que entorpeciera su función. (T.E. VI págs. 129 y 130.) Que en su presencia nadie puso a funcionar la máquina. (T.E. VI pág. 137.) Que él fue quien entregó la pala a los encargados de transportarla. Que antes de entregarla, debido al ajoro, no pudo ser revisada; que la subió al trailer y dejó de bregar con ella. (T.E. VI pág. 184.)

Que la uña que sostiene el puntal de la pala en alto nunca había sido cambiada, pero que por regla general esa pieza nunca se cambia a menos que no sea en casos extremos. Que la barra que él señala como la causa del accidente es parte de las herramientas de la pala, que por razón de la prisa ese día se dejaron todas regadas dentro de la cabina de la máquina. (T.E. VI pág. 185.)

Más tarde vuelve a declarar como testigo de los demandantes aparentemente con el fin de atacar la credibilidad del testimonio del codemandado Goss. Santos declaró en esa ocasión que Goss se presentó al lugar de los hechos ese mismo

día del accidente por la tarde; que le preguntó qué había sucedido y él le señaló que el puntal se había caído. *Que en aquella ocasión Goss no probó los frenos de la pala, que no probó nada ese día.* (T.E. VII pág. 386.)

*JOSE BOSCHETTI TORRES,* operador de equipo pesado desde 1935, declaró que el Sr. Clotilde Santos había sido ayudante suyo en una obra en Fajardo. Que hace ocho o nueve años que conoce al Sr. Goss. (T.E. II pág. 54.) Que había trabajado meses antes operando la pala que causó la muerte de Piñero. Que la uña de la misma estaba bastante desgastada. Que un día se le cayó el puntal e iba a matar a un compañero de trabajo. (T.E. II pág. 57.) Que eso sucedió cuando él estaba trabajando en un proyecto de la Capitol Construction en Guayanilla. Que tal incidente ocurrió como tres meses antes de que se le cambiara el sistema a *dragline* para alquilarla a Piñero. Que él informó de esa situación al codemandado Goss cuando la pala iba a ser trasladada a un proyecto en Bayamón. (T.E. II pág. 59.) Que después de ese incidente no se le hizo reparación alguna de esa pieza. Que la uña de la pala estaba mala. (T.E. II pág. 60.) Que lo que se desgasta es la parte fija de la pala que hace contacto con la uña, la pieza que es fija. Que muchas veces se le pone una soldadura para rellenarla. Que la uña movible que encaja en la pieza fija también se desgasta. (T.E. II pág. 64.) Que no ocurrió más ningún incidente porque él nunca más volvió a dejar la cuchara en el aire, siempre la dejaba en el piso. (T.E. II pág. 65.) Que la pala tiene dos frenos, uno para manipularla y otra para dejarla en suspensión. (T.E. II pág. 66.) Que conoce esa pala desde 1954. Que estaba para aquella época tirada en el piso en Ensenada con el *center pin* roto y allí fue donde Goss la remató del Navy. (T.E. II pág. 68.) Que él no cree que la barra de 28 pulgadas abandonada en la cabina fuera la causa del accidente pues había mucha distancia entre el sitio donde estaba y el freno para poder caer sobre el pedal.

(T.E. II pág. 74.) Reitera que le notificó al codemandado Goss sobre el desperfecto de la pala y éste le expresó que se arreglaría cuando hubiera tiempo. (T.E. IV pág. 261.) Que cuando estaba trabajando nunca la dejaba en el aire, siempre la ponía en el piso y cuando trabajaba con ella la enfrenaba con el pie. Que nunca le quitaba el pie porque se caía. Que esto nunca se lo informó a nadie en el proyecto. Que luego pasó a trabajar con la máquina a un proyecto en Cataño. (T.E. IV pág. 267.) Que más tarde trabajó sacando grava con esa pala en la P.R. Aggregates en Carolina y siempre ponía el pie para que no se cayera. (T.E. IV pág. 271.) Que cuando comenzó el cambio del sistema de *dragline,* se abrió la cintura, tuvo que reportarse enfermo y cuando retornó ya Clotilde Santos tenía su trabajo y supo que éste la iba a operar en el proyecto de Piñero. Que el compañero en Guayanilla que él iba a golpear con la pala se llamaba Enrique Colón, y operaba otra pala a su lado. Que mientras operaba la máquina siempre ponía el pie en el freno y cuando salía fuera de la cabina dejaba la cuchara en el piso. (T.E. IV pág. 275.) Que el proyecto en Guayanilla duró como nueve meses. (T.E. IV pág. 281.) Que el desgaste de la uña era como de unos tres octavos de pulgada. (T.E. IV pág. 287.) Que el incidente en Guayanilla ocurrió en los momentos en que él iba a tomar café, dejó el cucharón arriba y se cayó. (T.E. IV pág. 293.) Que no se lo reportó a su superior inmediato porque como no le hacía falta ese aditamento para operar la pala y para tener cuidado, no lo creyó necesario. (T.E. IV pág. 297.) Que tampoco se lo reportó a la Capitol Construction dueña del proyecto, que sí se lo notificó a Goss porque él era quien hacía las reparaciones. (T.E. IV pág. 298.)

*JORGE ESCUDERO,* Ingeniero Civil, especializado en electricidad, declaró que conocía tanto al occiso como al codemandado Edwin Goss. (T.E. IV pág. 205.) Que después del accidente fue llamado en capacidad de perito por el

Sr. Emilio Piñero y el Sr. Simonpietri, junto con el Ingeniero Oscar Valle, para que examinara la pala que causó la muerte a ver si tenía algún desperfecto y qué cosa pudo haber causado el accidente. (T.E. IV pág. 205.) Que ese día examinó la pala en compañía del Ingeniero Oscar Howe. Que eso sucedió como a los tres días luego de la muerte del causante de los demandantes. Que la pala ese día se encontraba en el proyecto del señor Piñero en la carretera de Canóvanas. (T.E. V pág. 207.) Que se examinó la banda del freno y se encontró en buenas condiciones; que por eso no se prendió el motor de la pala; que la uña de seguridad del freno estaba algo defectuosa. Que lleva bregando más de quince años con palas de esa clase. Que se dedica al negocio de excavaciones y al negocio de alquilar equipo y además vende palas ·mecánicas. (T.E. V pág. 208.) Que esa uña tiene la función de mantener el brazo en suspensión. Que esa uña es la que aguanta el freno. (T.E. IV pág. 209.) Que al examinar la uña encontró que la misma tenía cierto desgaste como de un octavo a tres dieciseisavo de pulgada. Que la uña se desgasta debido a la fricción. (T.E. IV pág. 212.) Que esa pieza es susceptible de cambiarse; que del examen practicado él diría que tal pieza necesitaba repararse. Que en las condiciones en que ocurrió el accidente él no puede ver otra causa que no fuera que la uña se zafó por el desgaste producido por la fricción. (T.E. IV pág. 213.) Que él nunca se correría el riesgo de pararse debajo de una cuchara de una pala de esa naturaleza. (T.E. IV págs. 229 y 230.) Que recomendó al Sr. Millín Piñero que esa máquina no se trabajara sin hacer la reparación del *latch* o uña. (T.E. IV pág. 241.) Que cuando él alquila una de sus máquinas él la investiga y luego envía a uno de sus mecánicos para que haga una revisión completa y entrega la máquina en las mejores condiciones posibles. *Que en el caso de esa uña una inspección fácil* hubiera sido suficiente para determinar su desperfecto. (T.E. IV pág. 249.)

Que no se encontró ni tierra ni ganchos ni pedazos de madera dentro de la cabina de la máquina. (T.E. IV pág. 248.) Señala que él cree que el brazo se derrumbó debido a que la uña patinó debido al desgaste que tenía. Vuelve y repite que sería arriesgado situarse debajo del cucharón de la pala. (T.E. IV pág. 252.)

*JOHN GRAZEL* declaró que estudió equipo pesado en 1933 y desde esa época ha venido trabajando como operador y mecánico de esa clase de equipo. Que en la actualidad se dedica a alquilar equipo poseyendo dos grúas de diferentes tamaños. (T.E. II pág. 15.) Que él personalmente en su taller supervisa las condiciones mecánicas de su equipo a fin de mantenerlos en las mejores condiciones, especialmente cuando el mismo va a ser arrendado a terceras personas. (T.E. III pág. 17.) Que fue llamado por René Silva Vincenty, quien para aquella época trabajaba con Millín Piñero para que en su capacidad de perito determinara la posible causa del accidente ocurrídole a Héctor A. Piñero. (T.E. III pág. 23.) Que fue a examinar la máquina que estaba en Río Grande cerca del lugar donde iba a ser utilizada en la extracción de arena. (T.E. III pág. 24.) Que allí estaba Clotilde Santos el operador y él le preguntó. Que le solicitó que encendiera el motor para probar los frenos y ver como estaban funcionando. Que levantó el puntal (*boom*) y la cuchara varias veces, que mantuvo el puntal arriba y el freno, cuando se le puso la uña aguantó el puntal en suspenso, pero cuando él ejecutó un pequeño movimiento en el piso de la cabina automáticamente se derrumbó debido a que la uña se zafó. (T.E. III págs. 25 y 26.) Que esto ocurrió tres o cuatro veces. (T.E. III pág. 26.) Que él cree que la caída del puntal se debía a que la uña estaba desgastada y no tenía un agarre perfecto. Que él examinó esa uña y encontró que estaba desgastada. (T.E. III pág. 27.) Que se trata de dos piezas que tienen que estar perfectamente cuadradas para poder tener un agarre perfecto y en este caso

ambos pedazos de metal estaban desgastados. (T.E. III págs. 33.) Que después de un examen recomendó al Sr. Piñero que ordenara a Goss la reparación de esa pieza. Que se podía arreglar por medio de una soldadura que cubriera la parte desgastada. (T.E. III pág. 41.) Que la vida estimada de la uña dependerá del uso que se le esté dando a la máquina, que puede durar unos años y puede durar hasta 20. (T.E. III pág. 84.) Que él examinó esa máquina el primer lunes después del accidente como a eso de las 9:30 A.M. (T.E. III pág. 106.) Que el codemandado Goss llegó como dos horas después. (T.E. III pág. 109.) Que llevó a cabo la prueba de subir y bajar el puntal tres o cuatro veces. (T.E. III pág. 111.) Que más o menos como un *30% de la uña estaba gastada y también del agarre.* (T.E. II pág. 3.) Que un brinco súbito de la máquina podría causar que la uña se zafara. (T.E. II pág. 4.) Que ese puntal podría caerse por dos razones, porque la uña no agarre o porque el bulón se parta. (T.E. II pág. 11.) Pero que sólo una vez en su vida él ha visto que ese bulón se ha partido. Y en este caso no estaba partido. (T.E. II pág. 12.) Que cualquier materia extraña como por ejemplo ganchos, hojas, cáscaras, semillas, almendras, etc., podría interrumpir el agarre de la uña (T.E. II pág. 33) pero que él examinó la cabina y no encontró materia extraña alguna que sirviera de obstáculo al agarre. Que la uña estaba gastada, tenía mucho juego y una pequeña conmoción hubiera causado que el agarre se zafara. (T.E. II pág. 39). Que en su examen él encontró que el bulón que sostenía la uña no estaba roto. (T.E. II pág. 42.) Que cuando se trabaja con esas máquinas no debe uno situarse debajo del puntal de las mismas pero que todo el mundo lo hace. (T.E. II pág. 42.)

*CARLOS JOSE BENITEZ ANCA*, quien en resumen señaló ser el presidente de la tercera demandada Transporte Metropolitano, Inc. (T.E. VII pág. 79.) Que esa corporación se dedica al transporte de equipo pesado y se organizó en

1954. (T.E. VII pág. 80.) Que una vez fue empleado de la Concrete Mix, Inc., empresa donde el occiso tenía bastantes intereses económicos. (T.E. VII pág. 81.) Que cuando Piñero le ordenó la transportación de la pala no tenía un *trailer* disponible por lo que tuvo que tomar uno prestado de la firma de Rexach. (T.E. VIII pág. 87.) Que ese trailer tenía una capacidad como de 70 a 80 toneladas. (T.E. VII pág. 88.) Que con posterioridad al accidente la pala en cuestión fue objeto de un examen por parte de peritos; que él estuvo presente en ese examen. Que se probó la uña unas diez o doce veces y cuando se trataba de dejar la máquina arriba la uña no enganchaba bien. Que de esas diez o doce veces como en dos o tres ocasiones la uña no enganchó bien, que cuando no enganchaba bien ésta se zafaba y la cuchara se caía. Que él tuvo oportunidad de observar la uña y creía que estaba desgastada. (T.E. VII pág. 124.) Que ambas piezas estaban desgastadas. (T.E. VII pág. 126.) Que en el examen habían varias personas presentes inclusive el operador Clotilde Santos Ortiz. Que el examen se hizo de diez a once de la mañana. (T.E. VII pág. 131.) Dice que él observó que en la cabina había hojas pero que no podía haber residuos grandes que interrumpieran la función de la uña ya que el pedal la cubre. (T.E. VII pág. 132.) Que entre el pedal y la uña sólo hay una pulgada y no cabe residuo grande alguno. Que de su examen él determinó que no habían residuos grandes. Que la uña tenía grasa y polvo pero que él cree que esto no pudo afectar. (T.E. VII pág. 133.) Que el día que se le hizo el examen a la pala estaban presentes, entre otras personas, los señores John Grazel, Millín Piñero y Clotilde Santos. Que una vez terminado el proyecto su compañía transportó la pala hasta la casa del codemandado Goss. (T.E. VII pág. 136.) Que se presentó como a las diez y media de la mañana al sitio donde iba a ser inspeccionada la máquina. Que se le ordenó a Clotilde Santos que prendiera la máquina. Que Clotilde Santos prendió la máquina y se apeó de la misma y

siguió caminando. Que él penetró en la cabina y se situó como si fuera a trabajar. Que subió y bajó el cucharón. Que esta operación la repitió diez o doce veces. Que en dos o tres ocasiones tuvo dificultad pues al meter el pie lo rebotaba el pedal. Que tenía que mover el pie de lado para que la uña encajara. (T.E. VII pág. 157.) Que John Grazel trabajó ese día con la máquina. (T.E. VII pág. 159.) Que él vio cuando Grazel trabajaba la máquina. Que movió el *boom* y el *dipper stick*. (T.E. VII pág. 162.) Que al apearse de la máquina tuvo que asegurar el pedal con una cadena. (T.E. VII pág. 167.) Ésa fue en esencia la prueba pertinente de los demandantes.

Por los demandados el primer testigo MICHAEL CHACKER, Ingeniero graduado de Rutgers University y del United States Navy Reserve, declaró que su especialidad es la Ingeniería Marítima; que dentro de esa especialidad ha tenido oportunidad de bregar con palas mecánicas. Que tuvo oportunidad de examinar el mecanismo de una pala en la propiedad del codemandado Goss. (T.E. VI pág. 222.) Que a él se le entregó una pieza; que cortó un pedazo de ella, de manera que pudiera haber un corte a través del metal, para que fuera posible ver la cantidad de desgaste en la misma antes de ser soldada. (T.E. VI pág. 226.) Que pulió la superficie, *que ese pedazo luego fue sometido a un baño de ácido para ver dónde el metal nuevo ha sido unido al metal original.* (T.E. VI pág. 231.) Que una pieza de esa naturaleza es impropio soldarse. Que de su *examen visual* pudo notar y determinó, a juicio suyo, que la pieza sólo tenía un 10% de desgaste. (T.E. VI pág. 233.) Que a su juicio un desgaste de esa intensidad no es suficiente para convertir en peligrosa la operación de una máquina de esa naturaleza. Que la máquina de los equipos son diseñados de manera que puedan resistir de un 20 a 30% de desgaste sin que se tornen en peligrosos. (T.E. VI pág. 234.) Que otras razones además del desgaste de la uña pueden causar un accidente de esa

naturaleza tales como el que fallara un pasador, la fractura de cualquiera de las partes moldeadas, que se rompa un muelle o resorte, o debido a que un cuerpo extraño se introduzca en el mecanismo de la pala. Que este cuerpo extraño podría consistir de piedra, madera o cualquier otro material que cayera entre las dos piezas. (T.E. VI pág. 235.) Que esas máquinas tienen una vida estimada muy larga, que en la actualidad hay de esas máquinas operando en la isla que tienen 40 ó 50 años. Que la uña se introduce 1/4 de pulgada dentro de la pieza fija o sea 1/4 pulgada de la uña descansa dentro de la otra pieza. (T.E. VI pág. 252.) Que en la pieza fija pudo medir el desgaste con un protractor y que tenía un desgaste como de un 10% pero en la uña lo hizo observando las esquinas. Que midió la altura con un micrómetro de profundidad. (T.E. VI pág. 258.) *Que él no pudo observar las dos piezas juntas funcionando en la máquina.* (T.E. VI pág. 275.) *Que nunca ha operado una pala. Que nunca vio funcionando la pala en cuestión.* Que cuando la vio por primera estaba desarmada en el patio de la casa del codemandado Goss. Que la misma iba a ser reparada. (T.E. VI pág. 299.) Que él no está testificando acerca de la eficacia de los frenos, que sobre eso él no puede declarar pues tendría que montar la pieza antes. (T.E. VI pág. 311.) Que cuando él testificó sobre la tolerancia que resisten estas piezas se estaba refiriendo a la práctica general de la Ingeniería, no se estaba refiriendo a las piezas de esa máquina Northwestern. Que él se estaba refiriendo a máquinas o equipos de esa clase en general. (T.E. VI pág. 313.) Después señaló que el desgaste de la pieza que él examinó no era suficiente para que por culpa de eso nada más se zafara. (T.E. VI pág. 329.) Que él nunca se situaría debajo de ninguna pala por ser peligroso; que eso no sería una norma de seguridad. (T.E. VI pág. 335.)

El segundo testigo pericial de los demandados *NATHA-NIEL WARMAN*, declaró haber estudiado preingeniería

en Potomac State College en Virginia terminando su bachillerato en ciencias en la Academia Naval de Annapolis en 1931, que además estudió un curso postgraduado de ingeniería en el Instituto de Tecnología de California. (T.E. VI pág. 352.) Que en condiciones normales esa pieza en particular (la uña) debe tener una vida estimada de 10 años o más. (T.E. VI pág. 358.) Que una uña puede resistir un desgaste de un 25 a un 40% y todavía rendir buen servicio. (T.E. VI pág. 361.) Que de haber estado la uña sometida a una tensión mayor durante la transportación debido a la vibración y a la posición del brazo aparecería que ésta debía estar en buenas condiciones. (T.E. VI pág. 367.) Que otras razones podían ser la causa del accidente, tales como aplicación impropia del freno, exceso de grasa, etc. (T.E. VI pág. 368.) Que cualquier desgaste reduce el margen de seguridad pero que hay un margen de desgaste que está dentro de la seguridad. (T.E. VI pág. 380.) *Que no pudo ver la pieza vieja en cuestión porque había sido repuesta.* (T.E. VII pág. 12.) *Que cuando él examinó la máquina ya se le había repuesto esa pieza. Que una de las piezas de encaje había sido cortada para ser examinada.* (T.E. VII pág. 13.) Que ese examen fue hecho un mes antes de su testimonio en corte, o sea durante el 1960. Que nunca antes había visto esa máquina. (T.E. VII pág. 14.) *Que él no examinó esa uña, que no tiene conocimiento alguno del desgaste de esa uña pero por su experiencia concluye que si aguantó durante toda la transportación era porque estaba en buenas condiciones.* (T.E. VII pág. 21.) *Que él cree que pudo ser posible que el operador haya puesto mal la uña.* (T.E. VII pág. 30.)

El tercer testigo, *THOMAS LUFF*, mecánico de equipo pesado en el Proyecto de la Capitol Construction en Guayanilla durante el tiempo que estuvo allí usándose la pala en cuestión, declaró que durante el tiempo que estuvo usándose allí esa pala ésta no tuvo desperfecto alguno, salvo un día en que la tierra se introdujo en las líneas del aceite. (T.E.

VII pág. 46.) Que si hubiese habido alguna dificultad con esa pala él era el primero que debía saberlo pues él trabajaba en el campo en aquella ocasión. Que la pala nunca se cayó; que él nunca tuvo conocimiento de que se hubiera caído. Que esa pala trabajó allí unos tres meses; que Boschetti trabajó en la misma desde el principio hasta que se la llevaron. (T.E. VII pág. 48.) Que Boschetti nunca le hizo observación alguna con relación a desperfectos en el freno, uña o el cucharón de la pala. Que está completamente seguro que Boschetti no trabajó allí durante 8 meses. (T.E. VII pág. 51.) Que él era la persona a cargo de las reparaciones de la máquina y nunca se reportó que el freno de la misma estuviese defectuoso. (T.E. VII pág. 51.) Que durante esa estadía allí nunca el brazo se cayó. Que si hubiese ocurrido allí cualquier accidente él lo hubiese sabido. (T.E. VII pág. 63.) Sostuvo al final que el Sr. Boschetti era un operador muy serio y eficiente en su trabajo. (T.E. VII pág. 72.)

*RAMON GONZALEZ NIEVES*, cuarto testigo de la parte demandada declaró que trabajó con Boschetti en la refinería entre Bayamón y Cataño, que durante todo ese proyecto no hubo incidente alguno con relación a que el puntal de la pala se cayera. (T.E. VII págs. 182 y 183.) Que fue a su casa una persona solicitándole que viniera a declarar al juicio que la pala se zafaba. (T.E. VII pág. 188.)

El último testimonio de los demandados fue el del propio codemandado Goss, quien entre otras cosas, declaró que cuando supo del accidente se personó cuarenta minutos después del accidente al lugar de los hechos que examinó la cabina de la pala; que estaba mojada, que la uña estaba llena de hojas; que en esos instantes probó el freno para determinar si se zafaba y no se zafó. (T.E. VII pág. 270.) Que personalmente hizo una inspección de la pala antes de entregarla a Piñero; que él quería asegurarse que el freno y el *clutch* estuvieran en buenas condiciones por lo que él mismo los probó. (T.E. VII pág. 266.) Que le ajustó el freno; que encontró que fun-

cionaba perfectamente; *que eso lo hizo ese mismo día por la mañana*; y que Piñero recibió la pala como a las 8:00 de la mañana y él había hecho la inspección como a eso de las 7:00 A.M.

I

Nuestro Código Civil establece que: "Quedan sujetos a la indemnización de los daños y perjuicios causados, los que en el incumplimiento de sus obligaciones incurren en dolo, *negligencia* o morosidad y los que de cualquier modo contravinieren al tenor de aquéllas." Art. 1054; 31 L.P.R.A. sec. 3018. (Énfasis suplido.)

Añade más adelante el mismo texto legal que: "La culpa o negligencia del deudor consiste en la omisión de aquella diligencia que exija la naturaleza de la obligación y corresponda a las circunstancias de las personas, del tiempo y del lugar." Continúa la misma disposición señalando que "cuando la obligación no exprese la diligencia que ha de prestarse en su cumplimiento, se exigirá la que correspondería a un buen padre de familia." Art. 1057; 31 L.P.R.A. sec. 3021.

■ Hemos expresado que estas disposiciones legales tienen su aplicación en aquellas acciones judiciales en las cuales exista un antecedente contractual; *Arroyo* v. *Caldas*, 68 D.P.R. 689 (1948), por lo que han sido aplicadas a acciones de daños y perjuicios que tienen como base el quebrantamiento o incumplimiento de una obligación contractual. *Camacho* v. *Iglesia Católica*, 72 D.P.R. 353 (1951), *Maldonado* v. *Municipio de Ponce*, 39 D.P.R. 247 (1929). El mero hecho de que medie una acción torticera como consecuencia del incumplimiento de la obligación contractual no altera la naturaleza de la acción. *Rosario Quiñones* v. *Municipio de Ponce*, 92 D.P.R. 586, 595 (1965).[1]

---

[1] *Cf. Torres* v. *Fernández*, 56 D.P.R. 482 (1940) y *Oller* v. *Purcell Bauzá*, 92 D.P.R. 148 (1965).

De todas formas la mera calificación de daños y perjuicios dada a la presente acción, a la postre, no tendría efecto alguno en el resultado final del caso, pues bajo una u otra norma la evidencia aducida ante el tribunal a quo era suficiente para declarar con lugar la demanda. (²)

■ En caso de esta naturaleza la parte demandante asume la responsabilidad de probarle al tribunal a quo los siguientes elementos esenciales de su causa de acción: (1) que la maquinaria o equipo causante del daño sufría ciertos defectos mecánicos, (2) que esos defectos fueron la causa próxima y única del accidente, y (3) que el demandado conocía, o en el ejercicio de un debido cuidado debió conocer, esas imperfecciones; en otras palabras que una inspección razonable de la maquinaria hubiese bastado para descubrir las mismas. *Alexander* v. *Cheek*, 241 S.W.2d 950 (1951).

■ Si bajo nuestro ordenamiento jurídico es deber del arrendador entregar la cosa objeto del contrato en condiciones tales que permitan al arrendatario hacer uso de la cosa y utilizarla en las labores para la cual fue arrendada, Art. 1444 Código Civil de 1930; 31 L.P.R.A. sec. 4051, *Cole* v. *Escambrón Development Co.*, 73 D.P.R. 520 (1952), no debe, el arrendador de un equipo o maquinaria como la aquí

---

(²) Manresa en sus *Comentarios al Código Civil Español*, Tomo VIII, Vol. 1, pág. 146 *et seq.* ha señalado que:

"Si partimos del sentido unitario que hemos dado a la noción de culpa, como algo que ha de concurrir para que la responsabilidad pueda declararse, observaremos la falta de fundamento para conceder tanta importancia, como muchas veces le damos, a la clasificación de la culpa en contractual y extracontractual (1), en esencia una misma, sin que neguemos presenten al ponérseles en juego con las respectivas situaciones de una y otra clase, ciertas particularidades, y que respecto a la llamada 'aquiliana' hayan de observarse en primer lugar las normas de los arts. 1.902 y siguientes, cual advierte el 1.093, ya comentado. Pero nada de ésta es obstáculo para impedir la división más allá de lo necesario de esa entidad, culpa que siempre ha de combinarse con la idea responsabilidad y la acción u omisión determinante del incumplimiento, para llegar al resultado, o sea la obligación de indemnizar; y en cuya función ha de operar siempre para que tal obligación pueda estimarse."

en cuestión, esperar que el arrendatario la examine; por lo tanto puede éste descansar en la confianza de que la otra parte contratante ha ejecutado su obligación entregando una maquinaria en condiciones de ser utilizada.

La minuciosidad del examen dependerá, en todo caso, del tipo de maquinaria o equipo que se esté ofreciendo en arrendamiento. Así, si se trata de una que aunque defectuosa sólo podría causar daños leves, su arrendador no viene obligado a llevar a cabo una inspección tan intensiva como aquella que debe efectuar aquél que se dedica a alquilar equipo o maquinaria inherentemente peligrosa, o que adquiera esa condición una vez puesta en operación. *Restatement of the Law, Torts*, sec. 408.

■ Se ha resuelto que, no empece que una grúa, pala mecánica o cualquier otro equipo pesado no pueden ser catalogados como artículos inherentemente peligrosos, éstos adquieren esa condición una vez sean puestos en operación, *Geffrey* v. *Langston Constr. Co.*, 58 So.2d 698 (1952), *Roberts* v. *Geo. M. Brewster & Sons*, 80 A.2d 638 (1951), 3A *Personal Injury—Action Defenses Damages*, sec. 105 pág. 352.

■ Se ha señalado además, que cuando, como en este caso, el arrendador ha adquirido el equipo o maquinaria de un primer adquirente, es decir, lo ha comprado en segundas manos, el deber de inspección impuéstale por la ley se intensifica exigiéndose en esos casos un examen más riguroso. Se le impone además la obligación de someter la maquinaria a una inspección a intervalos regulares, especialmente cuando la misma es inherentemente peligrosa. *Restatement of the Law, Torts* (supra).

En *De María* v. *Renee Operating Corp.*, 122 N.Y.S.2d 236 (1953) el tribunal de apelaciones se confrontó con una situación de hechos muy parecida a la de este caso. Allí la prueba aducida estableció que el arrendador había hecho una inspec-

ción ocular de la maquinaria y de varias de sus partes desmontadas antes de que la misma fuera entregada al arrendatario. La corte de apelaciones concluyó que ese mero examen ocular no era suficiente para librar de responsabilidad al dueño del equipo. Se señaló que su examen debió ser lo suficientemente riguroso como para descubrir no sólo los desperfectos mecánicos patentes si que también los latentes. Véanse además: Anno: *Personal Injuries Caused by Defective Bailed Equipment or Machinery*, 3 N.C.C.A. (3rd series) pág. 223, Anno: *Liability for Injury or Damage Caused by Negligent Operation of Crane Derrick or the Like*, 81 A.L.R.2d 473, Anno: *Liability of Bailor for Personal Injuries or Death Due to Defects in Subjects of Bailments*, 131 A.L.R. 845, Anno: *Liability of Bailor of Automotive Vehicle or Machine for Personal Injury or Death Due to Defects Therein*, 46 A.L.R.2d 408; *Scharf v. Gardner Cartage Co.*, 113 N.E.2d 717 (1953), *La Rocca v. Farrington*, 93 N.E.2d 829 (1950), *Asplund v. Driskell*, 37 West's Cal. Rptr. 652 (1964).[3]

La prueba pericial aducida, a fin de establecer o negar la existencia de la imperfección mecánica, fue unánime en cuanto a aceptar que la uña que encajaba el freno para mantener el puntal de la pala en suspensión estaba desgastada. Donde realmente hubo discrepancia fue en cuanto al por ciento o cantidad de desgaste existente. Tampoco hubo acuerdo en cuanto a si, aun aceptando la existencia del desgaste, esa pieza podía o no sostener con razonable seguridad

---

[3] El Reglamento de Seguridad Industrial para el Corte y Arrastre de Caña de Azúcar, Boletín Núm. 3, 5ta. ed. (1964) a la página 15 señala que:

"(k) Toda grúa deberá inspeccionarse antes del comienzo de la zafra y periódicamente durante el proceso de los trabajos, para ver si la estructura, cables, rodaduras y patecas de la misma se mantienen en buen estado y si la maquinilla funciona adecuadamente. *Tan pronto se advierta alguna pieza o artefacto averiado o defectuoso, deberá detenerse el trabajo de la grúa y notificarse al mayordomo o a la persona encargada del trabajo, para que ésta ordene las reparaciones necesarias.* Los mecanismos deberán mantenerse en buen estado." (Énfasis nuestro.)

el puntal de la pala en alto. El tribunal sentenciador descartando la más confiable y mejor calificada evidencia, creyó en su totalidad la prueba aducida por los demandados tendiente a demostrar que el desgaste encontrado en la uña no era suficiente razón o causa para que se zafara el puntal de la pala.

■ Consistentemente hemos resuelto que ningún tribunal está obligado a seguir indefectiblemente la opinión, juicio, conclusión o determinación de un perito o facultativo, sobre todo cuando está en conflicto con testimonios de otros peritos y que todo tribunal está en plena libertad de adoptar su criterio propio en la apreciación o evaluación de la prueba pericial y hasta descartar la misma aunque resulte ser técnicamente correcta. *Concepción Guzmán* v. *A.F.F.*, 92 D.P.R. 488, 495 (1965); *Pereira* v. *E.L.A.*, 91 D.P.R. 750, 753, (1965); *Pueblo* v. *Sánchez*, 79 D.P.R. 116, 121 (1956); *E.L.A.* v. *Bravo*, 79 D.P.R. 779, 786 (1956).

Los peritos presentados por la parte demandada no tuvieron el suficiente contacto con la pieza objeto de examen como para emitir una opinión verdaderamente fundamentada y creíble sobre el estado físico de la misma. Por otro lado los de la parte demandante tuvieron mucha más oportunidad de llevar a cabo un mejor examen.

Uno de los peritos de la parte demandada nunca tuvo la oportunidad de examinar la pieza. Testificó que su declaración estaba basada en sus conocimientos generales de ingeniería. Planteó su teoría de que si esa pieza aguantó el puntal, un poco suspendido, durante todo el trayecto del viaje, eso indicaba que la pieza estaba en buenas condiciones porque de lo contrario no hubiese aguantado. Nunca pudo observar la condición física de la pieza, no pudo ver el alcance de su desgaste, tampoco lo pudo observar funcionando, es decir en operación.

El otro perito presentado por los demandados tampoco tuvo oportunidad de examinar la pieza en su estado original.

Cuando la examinó ya su condición física había sido alterada. La parte donde se encontraba el desgaste había sido tapada o rellenada con una soldadura. Por esa razón le fue necesario someter esa pieza a un baño de ácido, a fin de poder distinguir el metal original del metal añadido. Bajo estas condiciones observó la pieza y determinó la cantidad de desgaste. Tampoco tuvo oportunidad de observar el funcionamiento del mecanismo total de la pala, en otras palabras, no pudo ver, en particular, la pieza en funcionamiento. Su examen fue hecho *cinco años* después del accidente cuando ya se había reparado la máquina sustituyéndose esa pieza.

Por el contrario la prueba presentada por los demandantes tendió a demostrar que tres días después del accidente sus peritos examinaron toda la pala y que en particular examinaron la banda de sus frenos; que examinaron la uña y la pieza fija donde encaja la misma; que ambas tenían su desgaste; que encendieron el motor de la pala; que subieron y bajaron varias veces el puntal de la misma; que pusieron a funcionar el mecanismo de la uña unas cuantas veces y cuando se trató de mantener el puntal en alto se le cayó. Los peritos allí reunidos concluyeron que esa pieza desgastada fue la causante del accidente por lo que debía ser sustituida.

Esta prueba quedó corroborada por el testimonio del Sr. Boschetti quien señaló que, en una ocasión, estando él operando esa pala mecánica y cuando tuvo que dejar el puntal en suspenso para ir a tomar café, el puntal se cayó y por poco lesiona a uno de sus compañeros.

Como ya hemos señalado, las condiciones bajo las cuales los peritos de la parte demandante examinaron la pieza objeto de la investigación eran mucho más propicias a una conclusión mucho más certera en cuanto al estado físico de la uña, razón por la cual debió merecer mayor peso y credibilidad que

la de la parte demandada. (4) *Concepción* v. *Autoridad Fuentes Fluviales*, supra; Anno: *Proof of Economic Scientific and Technical Facts—Expert Witnesses Some Practical Problems*, 23 F.R.D. 467.

En cuanto al otro aspecto del caso, es decir, lo referente al deber de inspección de la parte demandada, el tribunal a quo concluyó, basado en el propio testimonio del codemandado Goss, que éste había cumplido con su obligación, pues antes de entregar la pala en cuestión a la porteadora, había inspeccionado el sistema de frenos de la misma.

Un examen de toda la evidencia testifical tiende a señalar que el testimonio del codemandado Goss no debió merecer entero crédito. En primer término, la prueba de cargo y de descargo estableció que el occiso tenía suma prisa en usar ese mecanismo, que por esa razón los empleados de la porteadora se presentaron bien temprano a recogerlo; *que llegaron después de las siete de la mañana;* que fue Clotilde Santos quien entregó dicha pala a los empleados de la tercera demandada, que debido a la prisa no se pudo recoger nada dejando todas las herramientas dentro de la cabina de la máquina.

El codemandado Goss testificó que hizo su examen como a eso de las siete de la mañana y que la máquina fue entregada como a eso de las ocho de la mañana. Cabe ante estas manifestaciones preguntarnos ¿si Goss estaba allí cuando fueron a recoger la máquina, por qué tuvo Clotilde Santos que entregarla? ¿Por qué no lo hizo él personalmente? Poco crédito debió merecer su testimonio cuando su propio testigo contradijo sus manifestaciones. Goss declaró que después de cono-

---

(4) Es cierto que el testigo Clotilde Santos manifestó que en aquel instante, cuando fueron a examinar la máquina, no se encendió el motor de la misma, ni se levantó su puntal. Sin embargo, dos testigos de la parte demandante testificaron lo contrario. Además es más lógico que se haya hecho el examen encendiendo su motor y levantando su puntal pues esa era la forma más práctica y adecuada de conocer la posible causa del accidente. Es decir, si querían saber por qué se cayó ese puntal lo más lógico era que lo levantaran y bajaran varias veces a fin de ver si se repetía lo que sucedió en el accidente.

cer el acontecimiento del accidente se personó al lugar de los hechos, que en ese momento se introdujo en la cabina de la máquina y probó los frenos y que éstos estaban en buenas condiciones pues no se zafaron. Sin embargo, el testimonio final de Clotilde Santos tendió a establecer que, si bien el codemandado Goss estuvo ese día en el lugar de los hechos, no había examinado nada allí.

Creemos que la verdadera actitud del codemandado surge de las declaraciones del testigo Boschetti quien señaló que al hacerle saber a Goss el hecho de que existía un desperfecto en el sistema de frenos de su pala, éste le manifestó que se arreglaría cuando hubiera el tiempo. Si esa había sido su actitud en el pasado ¿de dónde surge ahora esa extremada diligencia de examinar la máquina en tempranas horas de la mañana y minutos antes de ser entregada?

Además, el tiempo transcurrido entre el alegado examen y la entrega fue tan corto y la prisa era tanta, que, aun partiendo del supuesto de que se efectuó el mismo, su rigurosidad o minuciosidad no fue suficiente para librarlo de responsabilidad. *De Maria* v. *Renee Operating Corp.*, supra. Especialmente tratándose de una maquinaria con treinta años de uso adquirida en un remate. *Restatement of the Law, Torts,* supra.

El testimonio del Ingeniero Escudero, testigo pericial de la parte demandante, fue claro al señalar que un examen del sistema de frenos de la máquina hubiera bastado para descubrir el desgaste de la uña, por lo que en tal situación debemos imputar al codemandado Goss el conocimiento de ese defecto. *Alexander* v. *Cheek*, supra.

El tribunal a quo en sus determinaciones de hecho señala que la prueba pericial había demostrado que otros factores pudieron haber sido la causa del accidente.

■ A pesar de que la prueba presentada por los demandantes eliminó la posibilidad de que varios de esos factores señalados hayan sido los causantes del accidente, debemos

reiterar la posición de este tribunal en el sentido de que hasta ahí no llega la responsabilidad probatoria de una parte demandante. En *Murcelo* v. *H. I. Hettinger & Co.,* 92 D.P.R. 411, 427 (1965) señalamos:

"En este tipo de acción la parte demandante luego de haber presentado evidencia a cuya luz una persona razonable pueda quedar convencida de que el acto dañoso se debe a la culpa u omisión de la demandada *no está obligada a eliminar o excluir toda otra posible causa del suceso del cual se deriva la responsabilidad exigida.* Aun en el campo penal, cuando El Pueblo sólo ofrece evidencia circunstancial de culpabilidad, ya no tiene que ser ésta inconsistente con cualquier hipótesis razonable de inocencia. *Pueblo* v. *Bonilla,* 78 D.P.R. 152 (1955)." (Énfasis nuestro.)

Obviamente, la prueba de la parte demandante, estableció la responsabilidad de dicho codemandado, respecto a la causa del accidente y los daños causados en su consecuencia.

## II

Pasemos ahora a la determinación de los daños y perjuicios reclamados.

En los párrafos 4 y 7 de la demanda, sobre este punto, se alegó:

"4.—Que al momento de su muerte don Héctor A. Piñero tenía 29 años, era Ingeniero Civil y Contratista, tenía a su cargo, por su cuenta, los proyectos de la carretera Desvío-Loíza y el Centro de Obras Públicas del Gobierno de la Capital de Puerto Rico, proyectos que había adquirido en subastas y en competencia con las firmas de contratistas más prominentes del Estado Libre Asociado de Puerto Rico, por valor de más de dos millones de dólares ($2,000,000.00).

. . . . . . . . .

. . . . . . . . .

7.—Que como consecuencia de la muerte de don Héctor A. Piñero, los demandantes han dejado de recibir los alimentos, la compañía y la protección que él les proporcionaba, y con motivo a la naturaleza de las lesiones físicas que le causaron su muerte

y la forma trágica en que la misma ocurrió, los demandantes han padecido hondos sufrimientos y angustias mentales con pérdida de sueño, peso y apetito, y han tenido un prolongado período de nerviosidad, cuyos daños y perjuicios razonablemente se estiman en la suma de $100,000.00."

Posteriormente, a propuesta de la parte demandante, el tribunal de instancia permitió una enmienda a la demanda para aumentar la reclamación a $200,000.00. Se concedió la enmienda al comenzar el segundo día de juicio, que fue el 1 de marzo de 1960, no obstante la oposición de los demandados fundada en que tenía "derecho a reinvestigar esos otros $100,000.00." (T.E. pieza II, pág. 3.) El juicio empezó el 1 de diciembre de 1959 y terminó el 11 de agosto de 1960. En total hubo 14 días de juicio entre esas fechas.

Sobre la competencia, experiencia, reputación y relaciones profesionales del joven ingeniero Héctor A. Piñero, sus condiciones personales y sus probables éxitos en el ejercicio futuro, fue admitida evidencia testifical y documental. La primera consistió en los testimonios del ingeniero Manuel Font, Secretario Ejecutivo del Colegio de Ingenieros, Arquitectos y Agrimensores, del contratista señor Javier Zequeira Blanco y del señor Esteban A. Bird, entonces Vicepresidente Ejecutivo del Banco Crédito y Ahorro Ponceño.

Durante la declaración del primero, quedó estipulado lo siguiente: "Que Piñero nació el 3 de marzo de 1926; se graduó de ingeniero civil en el Colegio de Agricultura y Artes Mecánicas el 26 de mayo de 1946; a su fallecimiento en 4 de noviembre de 1955 estaba casado con la codemandante señora Prieto y tenía cuatro hijos en ese matrimonio que eran los cuatro menores codemandantes, era un ingeniero de reconocida reputación como tal en la comunidad y tesorero del mencionado Colegio de Ingenieros, Arquitectos y Agrimensores."

El urbanizador y contratista Zequeira Blanco, declaró extensamente sobre la labor profesional de Piñero, con quien, por varios años, llevó a efecto en sociedad la construcción o

arreglo de importantes obras públicas, con un valor de cerca de cuatro millones de dólares, recibiendo ellos un 9.5% de beneficio, como el Caserío San José, parte de la Carretera del 65 de Infantería, una pista en Roosevelt Roads, caserío en Canóvanas y cierta parte del aeropuerto internacional. Declaró también sobre un negocio de concreto mixto que tuvieron y que para ellos, con excepción de uno, todos esos negocios resultaron buenos, recibiendo Piñero 50% de los beneficios. Sobre las condiciones personales del finado Piñero declaró:

"El tenía un don de ser trabajador incansable y de ambiciones ilimitadas; y sus relaciones para con los demás; un atractivo personal muy grande que me hicieron ver en él una persona que tendría grandes triunfos en la vida." (T.E. pág. 3, pieza V, vista el 27 de julio de 1960.)

Sobre los últimos proyectos en que sólo y por su cuenta trabajaba Piñero, declaró este testigo:

"P. Dígame, ¿Ud. sabe en ese lapso de tiempo entre la fecha en que se terminó la última obra de la corporación y la muerte de Piñero qué proyectos de importancia tenía Piñero?

R. El tenía dos proyectos. El se llevó una subasta de obras públicas.

P. ¿De carreteras?

R. Obras Públicas Municipal. Todo eso que está frente al crematorio y un trozo de carretera y el 'by pass' Canóvanas.

P. ¿Eso era todo lo que tenía?

R. Yo creo que tenía dos o tres cosas más. Tenía dos o tres acueductos, alcantarillados de ciertos pedazos de tierra con algunas personas.

P. ¿Naturalmente, esa obra de obras públicas es una obra costosa? ¿Ud. fue a esa subasta?

R. No señor. Yo no estaba en Puerto Rico.

P. ¿No sabe a qué suma ascendía?

R. Era sobre un millón de dólares.

P. ¿Casi la mitad de lo que ascendía la obra del aeropuerto?

R. Casi igual.

P. ¿Ud. no financió eso ni dio el 'backing'?

R. No señor.

P. ¿Sin embargo él se llevó la subasta?

R. Ya él tenía propiedades y equipo y el banco y las compañías de seguros lo habían visto trabajar y le dieron todas las facilidades." (T. E. págs. 26 y 27, pieza V, vista el 27 de junio de 1960.)

El señor Bird testificó sobre las relaciones de crédito mantenida por varios años entre su banco y el ingeniero Piñero. Empezó con el financiamiento de medio millón de dólares para construir las pistas del Aeropuerto Internacional en que, según él, se tuvo "una magnífica experiencia . . . un gran éxito en el desarrollo del proyecto . . . y liquidaron todos los créditos del banco." (T.E. pág. 43, pieza V.) Declaró también sobre distintas actividades de Piñero, que su banco financió, desarrollándose ellas ". . . muy satisfactoriamente hasta la muerte de Piñero, . . ." entre ellas la urbanización de los terrenos del viejo hipódromo Las Monjas de Hato Rey, para la cual el banco prestó a Piñero y Andrés Reyes la suma de $2,000,000.00. Manifestó el Sr. Bird que la muerte de Piñero alteró el desenvolvimiento de sus negocios y proyectos, que otros contratistas e ingenieros tuvieron que hacerse cargo de ellos. Cuando se le preguntó por el Lic. Ochoteco de qué reputación gozaba el señor Piñero en la comunidad como hombre de negocios e ingeniero, contestó:

"Reputación más alta. El banco nuestro tenía la opinión más elevada que se puede tener de su integridad y capacidad y el suscribiente [sic] también la tenía."—pág. 49 Id.

Los exhibits 12 y 13 de la parte demandante se refieren a la construcción por Piñero de un centro municipal de obras públicas por valor de $1,154,890.00 y a la compra, urbanización y venta de solares urbanizados en los terrenos del antiguo hipódromo Las Monjas de Hato Rey, para lo cual, en carta de 27 de mayo de 1955, meses antes de morir, el Banco Crédito y Ahorro Ponceño, concedió el préstamo de $2,000,000.00 a que se refirió el testigo señor Bird.

Esa carta, firmada por Jorge Bermúdez y dirigida a Ernesto Reyes y Héctor Piñero, dice en su párrafo final:

"Como estas condiciones son las mismas bajo las cuales estructuramos esta transacción, y fueron sometidas por la carta del Sr. E. A. Bird al Sr. Ángel A. Sanz antes indicada, esperamos que tendrán la aprobación de ustedes y de Las Monjas Racing Corp., en cuanto a ésta se refiere, y que se ha de firmar esta transacción y llevarse a cabo con toda seguridad, y que ella será el comienzo de futuras y mayores transacciones de mutuos beneficios, que afirmarán una vez más las relaciones que nos unen."

Las conclusiones de hecho 19na. y 21ra. del tribunal sentenciador son como siguen:

"19. Que el señor Héctor A. Piñero, quien nació el 3 de marzo de 1926, teniendo por tanto a la fecha de su muerte 29 años de edad, se graduó de ingeniero civil en el Colegio de Ingeniería de la Universidad de Puerto Rico, y era miembro de la Asociación de Ingenieros de Puerto Rico, que por sus ejecutorias profesionales gozaba de una excelente reputación como tal ingeniero civil, habiendo realizado en el ramo de la ingeniería proyectos importantes, adjudicados a él mediante subastas públicas, tanto para el Gobierno del Estado Libre Asociado de Puerto Rico, como para el Gobierno de la Capital, y que en el momento de ocurrir su muerte se encontraba desarrollando varios de los mencionados proyectos, al igual que proyectos privados donde él tenía intereses económicos. Que no obstante el relativo corto tiempo que venía ejerciendo su profesión, había tenido éxito económico y disfrutaba de sólido crédito bancario, al igual que con las compañías dedicadas a la prestación de fianzas a contratistas en relación con obras públicas.

. . . . . . . . .

21. Que los únicos universales herederos del señor Héctor A. Piñero lo son los demandantes, sus hijos Georgina María, Celia María, Héctor y José Ramón Piñero Prieto, respectivamente a la fecha de la muerte de su citado padre, aproximadamente de 7, 6, 5 y 4 años de edad, habidos todos en su matrimonio con la codemandante señora Georgina Prieto, quien en

su consecuencia era su viuda supérstite a la fecha de la radicación de la demanda, habiendo contraído segundas nupcias, teniendo a la fecha de su muerte el causante de los demandantes constituido su hogar en compañía de todos."

Tomando en cuenta todos los factores para la concesión de daños y perjuicios presentes en este caso, entre ellos la edad del ingeniero Piñero, las de sus 4 hijos, el matrimonio posterior de la codemandante señora Georgina Prieto y los demás elementos de pérdida de la compañía, sufrimientos y angustias personales que natural y ordinariamente siguen a la muerte del esposo y padre, estimamos como importe total y razonable de los daños y perjuicios sufridos por ellos la suma de $200,000.00. Véanse *Vda. de Fornaris* v. *American Surety Co. of N. Y.*, 93 D.P.R. 29 (1966) y *Rodríguez* v. *Ponce Cement Corp.*, 98 D.P.R. 201 (1969).

■ Aunque el accidente que originó este litigio ocurrió con anterioridad a la fecha en que entró en vigor la Ley Núm. 28 de 9 de junio de 1956, que enmendó el Art. 1802 de nuestro Código Civil, visto lo prevenido en el Art. 1056 del mismo Código en concordancia con sus Arts. 1042 y 1057, y visto también lo expresado en *Ramos* v. *Carlo*, 85 D.P.R. 353 (1962), especialmente a las págs. 366 a 369, cuya doctrina ahora expresamente adoptamos, y, además, vista la erudita opinión concurrente del entonces Juez Asociado señor Ortiz, en *Irizarry* v. *Pueblo*, 75 D.P.R. 786 (1954), a la luz de las circunstancias de personas, tiempo y lugar concurrentes determinamos: que el ingeniero Piñero fue culpable de negligencia contributoria, la que fijamos en un 30% en uso de la facultad moderadora que nos concede dicho Art. 1056. Por ello, el indicado importe de los daños y perjuicios debe quedar reducido finalmente a $140,000.00, a ser pagados en la siguiente forma: $17,500.00 para la codemandante Georgina Prieto y el remanente de $122,500.00, por partes iguales, para los menores codemandantes Georgina María, Celia María, Héctor y José Ramón Piñero Prieto.

Por lo aquí expuesto, nuestra decisión en *Kobler* v. *Escambrón Development Corp.*, 85 D.P.R. 743 (1962) queda revocada.

*Se revocará la sentencia recurrida y se declarará con lugar la demanda condenándose al codemandado Edwin V. Goss a pagar a los demandantes la cantidad de $140,000.00 en la forma indicada, y, a la codemandada Maryland Casualty Company, se le condenará a satisfacer solidariamente dicha condena, hasta la suma de $50,000.00, límite máximo de responsabilidad bajo su póliza, con las costas, incluyendo las del presente recurso, y al pago solidario de $10,000.00 de honorarios de abogados por servicios prestados en primera instancia.*

El Juez Presidente Señor Negrón Fernández no intervino.

Los Jueces Asociados Señores Pérez Pimentel y Santana Becerra están conformes en que se hayan determinado en la suma de Doscientos Mil Dólares los daños y perjuicios causados, pero disienten en cuanto a la atribución de negligencia contributoria al perjudicado ingeniero Piñero, por entender que la prueba no sostiene dicha conclusión.