EMILIO CASIANO CRUZ ET AL., demandantes y recurridos, *v.* AUTORIDAD DE LAS FUENTES FLUVIALES DE PUERTO RICO, demandada y recurrente.

*Número:* R-68-77    *Resuelto:* 7 de diciembre de 1970

*José Antonio Arabía* y *Luis A. Lugo, Jr.,* abogados de la recurrente; *Luis A. Negrón Lizardi,* abogado de los recurridos.

PER CURIAM: Recurre la Autoridad de las Fuentes Fluviales de la sentencia en este caso que la responsabilizó por la ocurrencia de un fuego en la finca del señor Carlos Caraballo. Concluyó el tribunal de instancia que "las referidas líneas conducían energía eléctrica, y debido a la expansión o la distancia entre uno y otro poste y al peso de los alambres sobre la finca del Señor Caraballo, los referidos alambres se partieron o quebraron el día 21 de marzo de 1965, cayendo los mismos sobre la finca del anteriormente referido Carlos Caraballo y produciendo un fuego que se extendió por todo el barrio pasando a la finca de los demandantes y ocasionándole daños a éstos." En tal virtud condenó el tribunal de instancia a la Autoridad a pagar los daños sufridos por los recurridos ascendentes a $1,100 más $500 de honorarios de abogado.

Concluimos que el tribunal de instancia incidió; que debe revocarse su sentencia y desestimarse la demanda en este caso. A continuación relacionamos las razones en que se apoya este dictamen.

Apunta la recurrente que el tribunal de instancia incidió al concluir que alambres de la Autoridad se partieron el día 21 de marzo de 1965 cayendo al suelo y produciendo un fuego que ocasionó daños a los recurridos y al imponerle honorarios de abogado.

Con respecto al origen del fuego testificó por los recurridos la señora Blanca Quiñones Vélez. Dijo que en 21 de marzo de 1965 a eso de las tres de la tarde estaba sentada debajo de un árbol en el patio de su casa en el barrio Las Vegas de Yauco cuando "de golpe se reventó un cable de unas líneas eléctricas que pasaba por la finca de Emilio Casiano y cayó abajo en la caña del señor Carlos Caraballo" donde "había un palo seco y el cable cayó sobre el palo seco y cogió fuego." Al partirse el cable la testigo oyó "como una explosión"; que al caerse prendió fuego al árbol de yagrumo y dicho fuego se extendió por todo el barrio; que

estuvo ardiendo una semana; que para esa fecha "hacía viento" y el día era "seco"; que una brigada de la Autoridad de Fuentes Fluviales llegó de 3:30 a 4:00 de la tarde junto con los bomberos pero "no hicieron nada"; que con motivo de hacer las reparaciones después del fuego "cortaron la corriente" a ella y a todo el barrio; que ella y el barrio recibía corriente desde antes del fuego; que "el cable, estaba estrecho y se reventó"; que no rozó con otro cable; la brigada de la Autoridad estuvo en el lugar del fuego hasta las 6:30 de la tarde.

Casiano Cruz testificó que "El día 21 de marzo como de una a tres más o menos, yo me encontraba en mi finca de Vegas, que es una finca de ganado y la señora aquí vive en una loma que hay dos postes"; que cuando estalló el fuego "me encontraba como a tres hectómetros más o menos de retirado y sentí cuando el cable venía corriendo derecho abajo enredándose con los distintos árboles."

El testimonio de estos dos testigos es toda la prueba de los recurridos con respecto al origen del fuego.

Veamos ahora la prueba de la recurrente. Su Supervisor de Líneas, Max García, testificó que "tuvimos notificación de que había un alambre en el suelo en el barrio Vegas y yo fuí a investigar con una brigada y lo que encontramos fue un cable telemétrico"; que dicho cable se cayó al desprenderse un árbol que estaba seco "y se cayó sobre el árbol en la finca de Caraballo. Pasan por allí dos líneas de 38000 voltios y línea secundaria de 110 y el cable telemétrico"; que el referido cable estaba a la mitad del tramo de torre a torre; que el telemétrico es un cable grueso que "traía varios hilos de alambre finito cubierto con goma el cual se utilizara para coger los niveles del agua de la represa"; que dicho cable "viene a través de una línea de postes separándose los postes a 30 pies más o menos" sostenido por un cable de acero conocido como mensajero y además sostenido a cada poste por una abrazadera; que encontraron el cable

telemétrico, "estaba en buenas condiciones pero aparentemente pillado . . . estaba en el suelo. Cuando le cayó el árbol
se rompió la abrazadera y lo pilló contra el suelo. Cuando
nosotros llegamos tuvimos que cortar el árbol para poder
sacar el cable"; que este cable "estaba chamusqueado nada
más . . . . Lo cogimos y lo levantamos"; que no hicieron
algo más; que la base del árbol estaba quemada; que no
había ningún otro cable en el piso; que las líneas de 38000
estaban bien, "en perfectas condiciones y pasaban sobre el
sitio donde cayeron"; que no hubo que repararlas; que estas
líneas pasan energía eléctrica a la subestación de Yauco
Núm. 2; que de caerse "Se quedaría sin servicio el pueblo
de Yauco" que dicho pueblo no se quedó sin servicio el día
del fuego; que había una línea secundaria para darle servicio a un proyecto de casas en construcción pero la misma
no estaba en servicio el día del fuego porque aún no se había
conectado; que de acuerdo con los récords de interrupciones
que lleva la Autoridad no hubo interrupción de los servicios
que ofrece a través de la subestación Núm. 2 de Yauco; que
el día del fuego "aquí hubo una interrupción ese mismo día
21 de marzo a eso de las once de la mañana. Hubo un fuego
grandísimo en Yauco, en una pieza de caña que está en la
parte de atrás . . . . Pasó la carretera Número dos, cogió
la línea número setencientos y quemó la torre de treinta
mil"; que la línea 700 no pasa por el barrio Las Vegas, las
que pasan por allí son la 1300 y la 2400. Que la línea secundaria para el proyecto de casas se puso en servicio en
21 de septiembre de 1965; que el cable telemétrico "lo más
que tiene son 30 ó 40 voltios."

Rafael Alfonso Tobal, Supervisor de Servicio de la sección
de Yauco testificó que la testigo Blanca Quiñones tiene servicio eléctrico desde el 25 de septiembre de 1965 y no desde
antes porque "todavía no se había instalado el servicio de
electricidad" para la localidad donde ella vivía.

El perito Félix Agostini Rodríguez testificó que inspeccionó el lugar del fuego; que "Esa inspección se hizo en el año mil novecientos sesenticinco cerca del mes de marzo o abril relacionada con un incendio que había ocurrido en una plantación de caña que había por allí. En dicha inspección pude observar que las líneas que discurren por el sitio son dos líneas de trasmisión de treintiocho mil voltios de conductor a conductor y de veintidos mil voltios de conductor a tierra. Específicamente las líneas mil tres cientos y mil cuatro cientos de Fuentes Fluviales. Además de dichas líneas, había cable de control telemétrico que controlaban las operaciones de represas de lagos de la planta de Yauco y hacían las funciones de llevar señales telefónicas o telemétricas a los artefactos que controlan el movimiento de las represas del lago. Dicho cable está separado de las líneas de trasmisión y discurre por una serie de postes de treinta pies de los que usualmente se llaman postes servidores. Las líneas de trasmisión estaban sostenidas en dos torres con compuertas de dos postes de madera, conocidos usualmente como la Torre H. y cuya altura de los postes era de sesenta pies y estaba cada uno en el tope de una loma y entre las dos lomas había una hondonada y en dicha hondonada los cables de la línea de trasmisión pasaban sobre el suelo a una distancia mayor de cincuenta pies y no se notaba ningún árbol creciendo inmediatamente debajo de la línea. Sí había un árbol seco hacia el borde de esa hondonada cuya base estaba quemada y cuyo árbol descansaba sobre el cable telemétrico mencionado anteriormente. Dicho cable telemétrico había sido arrancado del sostén del poste de treinta pies más cercano al árbol que estaba en el suelo y estaba aún dentro del soporte que sostenía el cable mensajero que sostenía el cable en su totalidad. Dicho cable se veía con la estación quemada, la cubierta exterior quemada en el punto cercano al suelo en donde el árbol seco descansaba sobre dicho cable, pero el cable en sí estaba entero, así como el mensajero que lo sos-

tenía. Esas son las observaciones el día de la inspección al sitio mencionado"; que la cubierta del cable telemétrico "había sido quemada por calor externo. Me parece que al quemarse la yerba que estaba sobre el terreno y quemar la base del árbol, éste cayó sobre el cable arrancando sus soportes y quemándose con el calor del fuego"; que "Un cable telemétrico lleva su nombre porque trasmite señales a la instancia. Esas señales se usan para controlar equipo, artefactos desde un punto a otro punto lejano o remoto. Dicho cable tiene la apariencia de un cable telefónico de varios pares. Pares son conductores finitos que van dentro de una aislación de papel y todo el conjunto usualmente son de doce a diecinueve pares y los más gruesos también. En este caso era un cable de doce pares. Los conductores finitos están aislados con un papel y todo ello dentro de una cubierta de goma o palietileno. En este caso la cubierta era de lona y dicha cubierta se usa, primero para darle resistencia mecánica a los conductores, ya que por ser tan finitos son muy flexibles y segundo, para darle resistencia mecánica y poder agarrar por los soportes al mensajero que lleva los cables en conjunto. Asimismo esa cubierta tiene el otro propósito de proteger los conductores dentro de la misma de las inclemencias del tiempo, tales como lluvia, humedad, sol y calor. Este cable usualmente la corriente que lleva es la corriente del impulso de las señales y esos impulsos normalmente son de cincuenta a sesenta voltios y no son impulsos contínuos, sino que son intermitentes. O sea, cuando en la Central dan una orden al equipo que está en la planta, remite dicha orden en forma de impulso eléctrico y se trasmite con los conductores finitos que están dentro de la cubierta. Eso hace presión al 'relay' o relevador en el punto y dicho 'relay' hace actuar el equipo que está siendo controlado"; que la corriente que va por el cable telemétrico no mueve las pesadas compuertas de la represa sino que actúa sobre un *relay* que hace funcionar los motores de la

compuerta "y que el 'relay' recibe energía aparte de la misma planta."

Un número de fotografías tomadas al día siguiente del fuego y récords de la recurrente admitidos en evidencia tienden a corroborar el testimonio de estos testigos pues demuestran que (1) las líneas de alta tensión permanecían en su puesto, el cable telemétrico estaba caído, así como un grueso tronco de árbol junto a un poste de dicha línea y los récords demuestran que no hubo interrupción de servicio en las líneas de alta tensión que pasan por el lugar del incendio y que la línea de baja tensión entró en servicio mucho después del fuego y que la casa de Blanca Quiñones no tuvo servicio de electricidad hasta meses después del fuego.

No creemos que el testimonio de la testigo Blanca Quiñones era digno de crédito. Testificó que un cable se "reventó de golpe" cuando no apareció cable eléctrico roto alguno en el lugar del incendio y sólo apareció el cable telemétrico desprendido de un poste y caído al suelo pero sin rotura alguna. Dijo que el fuego duró una semana. Sin embargo admitió que esa misma tarde los empleados de la Autoridad treparon a los postes y sólo estuvieron en el lugar del incendio unas tres horas. Se retiraron tan pronto levantaron y repusieron el cable telemétrico en el poste de donde se cayó. No es razonable suponer que la brigada de Fuentes Fluviales abandonase el lugar del incendio esa misma tarde y no volviese por allí si es que el fuego duró una semana. Tampoco es razonable suponer que los bomberos no pudiesen dominarlo mucho antes. Esta testigo primero dijo que su esposo se llamaba Manuel Jiménez pero cuando volvió a la silla de los testigos testificó que era casada con Manuel Quiñones. Dijo que con motivo de haber venido los empleados de la recurrente a hacer las reparaciones necesarias, se suspendió el servicio eléctrico en su casa y en las de los otros vecinos, servicio de que gozaba desde mucho antes del fuego. Por el contrario, la prueba demostró que la testigo no tuvo

servicio eléctrico antes del fuego sino que lo comenzó a recibir meses después del siniestro.

Por otra parte, la prueba de los recurridos no precisa que el cable que se alega se partió era uno de las líneas de alta tensión. No desfiló prueba otra alguna que confirmase que el cable caído era uno de tales líneas. Por lo tanto, no encontramos apoyo en la prueba para la conclusión del tribunal de instancia de que *"las referidas líneas* conducían energía eléctrica, y debido a la expansión o la distancia entre uno y otro poste y al peso de los alambres sobre la finca del señor Caraballo, *los referidos alambres se partieron o quebraron* el día 21 de marzo de 1965, *cayendo los mismos sobre la finca* del anteriormente referido Carlos Caraballo y produciendo un fuego que se extendió por todo el barrio pasando a la finca de los demandantes y ocasionándole daños a éstos."

La prueba demuestra que ninguno de los cables de la línea de alta tensión se quebró y cayó al cañaveral y así ocasionó el fuego. Tampoco pudo ocasionarlo la línea secundaria en construcción para dar servicio a casas de la vecindad pues en el día del fuego esta línea estaba muerta y no en servicio. Es más, esta línea no entró en servicio hasta meses después. [1]

Del propio testimonio de Blanca Quiñones, así como del de Max García, aparece que el cable que se cayó fue el telemétrico. No creemos que este hecho fuese la causa del fuego por varias razones. Hubo prueba de que el voltaje de esta línea no podía ocasionar el fuego. No apareció roto o "reventado" como dijo Blanca Quiñones sino solo con la cubierta chamuscada al extremo que pudo levantarse y reponerse en el poste de donde se cayó prontamente esa misma tarde. De manera que no podía producir chispas o de otro modo ser la causa del fuego.

---

[1] Nótese que una de estas líneas es designada como la 2400 por el testigo Max García y como la 1400 por el testigo Félix Agostini Rodríguez.

La deducción más razonable de la prueba en cuanto a la causa de la caída del cable telemétrico es que la ocasionó el árbol de yagrumo al desplomarse con motivo de quemarse su tronco. De manera que la causa del fuego necesariamente no pudo ser línea eléctrica alguna de la recurrente pues cuando el árbol desprendió el cable telemétrico de uno de sus postes, ya el incendio se había iniciado y había quemado tal extensión del tronco de dicho árbol que lo hizo caer.

En vista de lo expuesto, concluimos que la prueba no estableció relación causal alguna entre el daño ocurrido a consecuencia del incendio y las líneas eléctricas de la recurrente. Por esta razón la doctrina de *res ipsa loquitur* no es aplicable. Aun asumiendo que la doctrina de *res ipsa loquitur* fuese aplicable, la inferencia permisible que pudo haber surgido, quedó ampliamente rebatida por la prueba presentada por la recurrente. *Burgos Quiñones* v. *Autoridad Fuentes Fluviales*, 90 D.P.R. 613, 621, 622 (1964). *Cf. Prieto* v. *Maryland Casualty Co.*, 98 D.P.R. 594 (1970).

Por lo tanto, *se revocará la sentencia dictada por el Tribunal Superior, Sala de Ponce, en 14 de febrero de 1968, y se desestimará la demanda.*

El Señor Juez Presidente y los Jueces Asociados Señores Hernández Matos y Santana Becerra no intervinieron.