Feliciano Acevedo, Juez Ponente
TEXTO COMPLETO DE LA SENTENCIA
Royal Insurance Company of Puerto Rico, Inc. (Royal Insurance) nos solicita, mediante recurso de apelación, la revisión de la sentencia dictada el 19 de mayo de 1997 por el Tribunal de Primera Instancia, Sala Superior de Ponce, mediante la cual se declaró con lugar la demanda presentada en su contra por el apelado, Dye-Tex Puerto Rico, Inc. (Dye-Tex), reclamando cubierta para los gastos de reparación de los daños sufridos en una caldera de su propiedad.
En síntesis, la apelante cuestiona la apreciación de la prueba que realizó el tribunal a quo.
Por los fundamentos más adelante expuestos, procede la confirmación de la sentencia apelada.
I
Los hechos que enmarcan la controversia son los siguientes. Dye-Tex se dedica a la terminación y pintura de textiles en sus facilidades localizadas en el pueblo de Santa Isabel. En lo pertinente a la controversia ante nos, en sus labores Dye-Tex utilizaba una caldera para producir vapor marca Clearer Books.
El 10 de agosto de 1993, alrededor de las 2:00 p.m., el servicio de energía eléctrica fue *638 interrumpido por unos minutos. Los empleados de Dye-Tex apagaron la caldera para evitar que sufriera daños al regresar la energía eléctrica. Reanudado el servicio eléctrico, se encendió la caldera y continuó toda la operación de manera normal. Posteriormente, alrededor de las 2:30 p.m., volvió a ocurrir un fallo eléctrico. Sin embargo, en esta ocasión el mismo fue tan breve que impidió que los empleados pudieran apagar la caldera. Poco después, un empleado del área de pintura percibió una disminución en la producción de vapor. Debido a ello, tres empleados, incluyendo el gerente de la planta, acudieron a inspeccionar la caldera. Al llegar observaron que los instrumentos concernientes a la presión de vapor reflejaban una disminución del mismo. Al mismo tiempo, observaron que, aunque existía una disminución en el vapor, el homo de la caldera estaba encendido. En ese momento escucharon un "silbido" en el interior de la caldera y procedieron a apagarla inmediatamente.
La caldera averiada estaba asegurada por una póliza contra accidentes emitida por Royal Insurance. Esta tenía una vigencia de tres años cubriendo el período comprendido entre el 11 de julio de 1992 y el 11 de julio de 1995. Específicamente, la cubierta denominada "Boiler and Machinery Coverage" disponía, en lo pertinente:

"F. DEFINITIONS

1. "Accident" means a sudden and accidental breakdown of the "object" or a part of the "object". At the time the breakdown occurs, it must manifest itself by physical damage to the "object" that necessitates repair or replacement.

None of the following is an "accident":

a. Depletion, deterioration, corrosion or erosion;

b. Wear and tear;"

Por su parte, el término objeto es definido en un endoso a la póliza, de la siguiente manera:

"A. "Object" means any:

1. Boiler, fired vessel, unfired vessel normally subject to vacuum or internal pressure other than weight of its contents, refrigerating and air conditioning vessels, and any metal piping and its accessory equipment;"

Alegando la ocurrencia de un accidente, Dye-Tex le reclamó a Royal Insurance la suma de $108,000.00 como cantidad necesaria para reparar la caldera. Royal Insurance contrató los servicios del ingeniero Francisco J. Cabán Vale, inspector de calderas, para que examinara la caldera averiada. Este realizó su inspección de la caldera el 28 y 30 de agosto de 1993. Basada en los hallazgos del ingeniero Cabán, Royal Insurance negó cubierta por los daños de la caldera. Alegó que éstos fueron causados por la acumulación de escamas en el interior de los tubos de la caldera producto de un tratamiento deficiente del agua utilizada en la caldera. Por ello, concluyó que los daños a la caldera no fueron el resultado de un accidente y que por tanto no estaban cubiertos.
Así las cosas, el 4 de octubre de 1993, Dye-Tex contrató al ingeniero Ulpiano Castillo Vela, inspector de calderas, para que inspeccionara la caldera, efectuara una investigación y determinara la causa del fallo de la caldera. Este determinó que la causa del fallo se debió a la pobre condición en que se encontraban los tubos de la caldera en su exterior e interior, producto de la falta de mantenimiento y del tratamiento deficiente del agua con que se alimentaba la caldera.
Posteriormente, Dye-Tex contrató al Sr. James J. Fitzpatrick, operador de calderas, con licencia del Departamento del Trabajo del Estado New Jersey, para que inspeccionara la caldera y determinara la causa de fallo de la caldera. Este examinó la caldera en abril de 1994. Concluyó que la causa del fallo en la caldera se debió a un fuego seco ("dry-fire"), esto es que la caldera funcionó sin agua durante un período de tiempo.
Finalmente, el 22 de septiembre de 1994, Dye-Tex instó demanda en contra de Royal Insurance *639 alegando que su caldera había sufrido un accidente y que esta última se negaba a pagar los costos de reparación.
El tribunal a quo, mediante la sentencia apelada, declaró con lugar la demanda presentada por Dye-Tex y condenó a Royal Insurance al pago de $108,000.00 por los daños sufridos por la caldera, intereses sobre dicha cantidad desde la fecha de la sentencia hasta su pago, y las costas. El tribunal determinó que la causa de los daños sufridos por la caldera fue un accidente al dejar de recibir ésta el suministro de agua que necesitaba. Determinó que al reanudarse la energía eléctrica, luego de la última interrupción, la bomba de agua dejó de funcionar e impidió el suministro de agua a la caldera.
Contra dicho dictamen la apelante interpuso la presente apelación, bajo el señalamiento de error previamente reseñado.
Considerados los planteamientos de las partes, la transcripción de la prueba oral, los documentos sometidos y el derecho aplicable, procede confirmar la sentencia apelada.
II
Sabido es que, en el ejercicio de su facultad revisora, el foro apelativo se encuentra en igual posición que el foro de primera instancia en cuanto a evaluar la prueba pericial y documental ofrecida. Es por ello que, en lo que respecta a dicha evidencia, está facultado a adoptar su propio criterio en la evaluación de la misma. En cuanto a la pmeba pericial, nuestro Tribunal Supremo ha expresado:

"Reafirmamos la norma de que, como foro apelativo, no estamos obligados "a seguir indefectiblemente la opinión, juicio, conclusión o determinación de un perito o facultativo... y que todo tribunal está en plena libertad de adoptar su criterio propio en la apreciación y evaluación de la prueba y hasta descartar la misma aunque resulte ser técnicamente correcta".

Culebra Enterprises Corp. v. E.L.A., 143 D.P.R. _ (1997), 97 J.T.S. 128, a la pág. 105 (citando a Prieto v. Maryland Casualty Co., 98 D.P.R. 594 (1970)), (otras citas omitidas).
III
A la luz del derecho expuesto, evaluemos el señalamiento de error hecho por Roya1 Insurance.
Argumenta Royal Insurance que el tribunal sentenciador erró en su apreciación de la prueba. Específicamente señala que el tribunal descartó el testimonio pericial del ingeniero Ulpiano Castillo Vela y que su apreciación no representa el balance más racional, jurídico y justiciero de la totalidad de la prueba.
En primer lugar, debemos establecer que en el presente caso la determinación concerniente a la existencia de cubierta para la asegurada, Dye-Tex por los daños sufridos por su caldera depende exclusivamente de la causa que se determine provocó el fallo de la misma. Tanto Dye-Tex como Royal Insurance aceptan que, de haber sido un "dry-fire" o un nivel bajo de agua la causa del fallo, ello constituiría un accidente, lo cual estaría cubierto por la póliza de seguro. Todo lo contrario ocurriría, si la causa del fallo fuese el sobrecalentamiento de los tubos como resultado del pobre mantenimiento a la caldera. En esta última situación, ambos conceden que no existiría cubierta.
La prueba oral vertida en el caso del epígrafe es una voluminosa, con una transcripción de más de mil (1,000) páginas, correspondientes a cinco días de vistas de juicio en su fondo. Por Dye-Tex testificaron el Sr. Félix Torres, el Sr. Chad F. Vendette y los peritos, ingeniero Ramón Guzmán Casals y el Sr. James J. Fitzpatrick. Por Royal Insurance testificaron el Sr. Hipólito Colón Velázquez y los peritos, ingenieros Ulpiano Castillo Vela y Francisco Cabán Vale.
Sobre los hechos que acontecieron en las facilidades de Dye-Tex el 10 de agosto de 1993, no existe controversia. El testimonio incontrovertido del señor Torres estableció que poco después de las 2:30 p.m. hubo un corte breve de la energía eléctrica. Luego de ello, el señor Torres verificó que la caldera estuviera trabajando normalmente. Poco después fue notificado que la caldera no estaba generando vapor. Al ir a examinarla, observó en los instrumentos que estaba disminuyendo la presión de vapor, a pesar de estar prendida la caldera, y que escuchó un silbido, por lo que la apagó. (Transcripción, vista *640 de 23 de septiembre de 1996, págs. 37-40.) Por último, declaró que para la investigación del fallo de la caldera fue contratado originalmente el ingeniero Ulpiano Castillo. Id., a la pág. 86.
Fuera de los hechos acontecidos ese día, declaró que no tenía entrenamiento ni experiencia previa en la operación de calderas cuando asumió el puesto de gerente de la planta. Id., a la pág. 68. Aceptó que mientras fue gerente de la planta, no se llevaron registros del mantenimiento que se le daba a la caldera. Id., a la pág. 70.
Además, testificó que la persona que le daba mantenimiento a la caldera era el Sr. José A. Colón, mecánico de automóviles de profesión. Id., a la pág. 69. Sostuvo que las pmebas al agua de la caldera las hacía el señor Colón con un "kit" que tenía para ello. Id., a la pág. 75. Manifestó que luego del presente incidente, se contrató a una compañía privada para que tratara el agua que se le suministra a la caldera sustituta. Id., a la pág. 78. También testificó que el ablandador con que se trataba el agua para la fecha en que la caldera falló, estaba obsoleto y hubo que cambiarlo cuando entró en funciones la compañía privada para el tratamiento de agua de la caldera sustituta. Id., a la pág. 97.
Por último, declaró que las inspecciones que realizaba a la caldera el inspector Guillermo Tello, eran solamente de su exterior pues cuando él la inspeccionaba siempre estaba encendida. Id., a las págs. 79-81.
La restante prueba oral no pericial, consistente de los testimonios del Sr. Chad F. Vendette y del Sr. Hipólito Colón Velázquez, no resulta pertinente para la solución de la controversia ante nos. 
Siendo así, la cuestión ante nos se reduce a analizar el valor de la prueba pericial y documental en lo referente a la posible causa del fallo ocurrido en la caldera el 10 de agosto de 1993. No debemos pasar por alto que la investigación y reconstrucción de la posible causa del fallo en la caldera, depende en especial de prueba pericial especializada. La prueba pericial oral fue una extensa, sin embargo, en el descargo de nuestra responsabilidad, y estando en igual posición que el ilustrado foro de primera instancia para analizar el valor de la prueba pericial, expondremos en síntesis los testimonios vertidos.
Ingeniero Ramón Guzmán Casals Ingeniero Ouímico y consultor de Dye-Tex (perito presentado por Dye-Tex)
Declaró que, luego del fallo de la caldera, recibió una muestra de un tubo de ésta y observó una pequeña, pero bastante uniforme, acumulación de escamas {"scale") en su interior. Id., a la pág. 143. Además, testificó que tuvo la oportunidad de efectuar un análisis del agua que alimentaba la caldera. Expresó que, a base de sus exámenes, rindió un informe en diciembre de 1993, en el que concluyó que la cantidad de dureza en el agua era de cincuenta y seis (56) miligramos por litro. Id., a la pág. 145. Explicó que el estándar recomendable es cero (0). Id., a la pág. 161. A pesar de ello, sostuvo que con cincuenta y seis (56) él operaría una caldera. Id., a la pág. 163.
Sr. James J. Fitzpatrick operador de calderas con licencia del Departamento del Trabajo del Estado New Jersey (perito presentado por Dye-Tex)
Declaró que para abril de 1994 tuvo la oportunidad de examinar la caldera. Manifestó que no observó evidencia ni huellas de agua en el homo de la caldera. (Transcripción, vista de 24 de septiembre de 1996, págs. 109-111.) Explicó que si ocurre un fuego seco {"dry-fire"), en donde la caldera continúa funcionando sin tener agua, los tubos muestran distorsión y quemaduras azulosas. Id., a las págs. 118-120. Expresó que en su inspección de la caldera encontró la decoloración azulosa y la distorsión de los tubos del techo. Id,, pág. 124.
Testificó que, según fotografías tomadas en abril de 1994, el instrumento medidor de la presión de vapor se había detenido en una presión de cien (100) y que ello era característico de un nivel de agua bajo, toda vez que suelen quemarse los resortes. Id., a la pág. 136. Explicó que un tubo obstmido por escamas se sobrecalienta, cambia de color, se le forman ampollas y eventualmente revienta. (Transcripción, vista de 25 de septiembre de 1996, pág. 27.)
Manifestó, que si los tubos se hubieran roto estando en uso la caldera, se hubiese vaciado el agua, *641 alrededor de 600 galones, al homo y probablemente hubiese explotado. Id., a las págs. 51-53. Además, afirmó que de ser así, debió haber una línea sucia alrededor del homo. Id., a las págs. 54-57.
Testificó que los agujeros en los tubos no fueron causados por escamas, pues si ese fuera el caso hubieran formado una vejiga. Id., a la pág. 61. Declaró que existía una sorprendente ausencia de ampollas. Id., a la pág. 73. Expresó que para mediados de octubre de 1993 le comunicó a Dye-Tex su impresión de lo que causó la ruptura del tubo que le enviaron. Id., a las págs. 105-106. Sostuvo que poco antes de inspeccionar la caldera, se enteró que Royal Insurance había negado cubierta. Id., a la pág. 108. Afirmó que determinar la causa de un fallo en una caldera era muy sencillo y que en este caso formó su opinión sobre la causa en el mismo instante en que entró al homo. Id., a la pág. 117. Aceptó que para llegar a su conclusión no entrevistó a ningún testigo presencial de los hechos ocurridos ni examinó documentos. Id., a las págs. 117-120.
A preguntas de si había examinado los dispositivos de seguridad de la caldera, expresó que observó el dispositivo "magnetrol" y que la flota (''ball'') tenía quemaduras, pues estaba color marrón a pesar de que era de acero inoxidable. Id., a las págs. 121,124-125. Aceptó que el óxido de hierro causa una capa color marrón sobre el acero inoxidable. Id., a la pág. 131.
Finalmente, concluyó que el fallo de la caldera se debió a un "dry-fire", esto es, una falta de agua o un nivel de agua bajo que provocó que el quemador del homo causara daños al continuar calentando los tubos sin la presencia de agua.
Ingeniero Ulpiano Castillo Vela inspector de calderas (perito presentado por Royal Insurance)
Declaró que para octubre de 1993 Dye-Tex lo contrató para determinar la causa del fallo en la caldera. Id., a la pág. 214. Explicó que solicitó los registros de mantenimiento de la caldera y los de tratamiento del agua, pero nunca se los entregaron producidos. Id., a la pág. 215. Expresó que al inspeccionar la caldera entró al homo y observó una cantidad excesiva de hollín en el piso. Id., a la pág. 216. Testificó que era evidente el pobre mantenimiento a la caldera, pues los tubos tenían adheridos en su exterior una costra de residuos de petróleo que no había sido limpiada y, además, existía corrosión. Id., a las págs. 218-219.
Declaró también que observó unos tubos del techo con algún tipo de flexión y cinco tubos con perforaciones. Id., a la pág. 222. Explicó que obtuvo porciones de los cinco (5) tubos perforados así como de otros que no habían fallado y en todos observó escamas en su interior y en su exterior corrosión y ampollas incipientes. Id., a la pág. 223; Véase también Transcripción, vista de 26 de septiembre de 1996, pág. 172.
Testificó que el calderín de vapor {"steam drum”) estaba casi totalmente sólido de escamas y que en su vida había visto una situación como esa. (Transcripción, vista de 25 de septiembre de 1996, pág. 226.) Sostuvo que igual situación observó en el calderín de fango ("mud drum"). Id., a la pág. 233. Declaró además, que observó un pobre mantenimiento del equipo para el tratamiento del agua, específicamente los intercambiadores de calor descuidados y las válvulas del ablandador de agua que estaban inoperantes. Id., a la pág. 235. Manifestó también que las válvulas del calderín de fango no operaban adecuadamente. Id., a las págs. 235-236. En términos generales consignó que le pareció que hacía mucho tiempo que la caldera no recibía mantenimiento. Id., a la pág. 236.
Concluyó que tanto el tratamiento del agua como el de la caldera eran pobres y que la falla se debió a puntos calientes en los tubos provocados por una pobre transferencia de calor como resultado de la acumulación de escamas en su interior. Puntualizó que dicha situación se agravó debido a la corrosión extema que presentaban los tubos. Id. a las págs. 239-240. Manifestó que en su informe recomendó la contratación de una compañía privada para el tratamiento del agua utilizada para alimentar la caldera. Id., a la pág. 239.
Con respecto a los informes de inspección que le mostraron, declaró que de ser cierto que la inspección era exclusivamente del exterior de la caldera eso sería una violación de ley. Id., a las págs. 247-250. También explicó que el deterioro que observó sólo podía ser el resultado de un largo período *642 de mantenimiento inadecuado. Id., a la pág. 251. Sostuvo que determinar la causa del fallo de una caldera es un proceso complicado, pues son muchos los factores que deben examinarse. Id., a la pág. 254.
Testificó que un "dry-fires" o un nivel bajo de agua en una caldera es una catástrofe, que se rompen los tubos y que la caldera baila o se contorsiona como resultado del vapor que queda con poca agua. Explicó que esa energía hay que liberarla y puede ser de varias formas, como lo son las válvulas de seguridad para liberar presión o el funcionamiento automático de los dispositivos de seguridad para apagar la operación del quemador. Id., a las págs. 255, 257.
que examinó la flota de la caldera ("magnetrol ball") y ésta tenía un color cobrizo. (Transcripción, vista de 26 de septiembre de 1996, pág. 17.) Sin embargo, expresó que ese color cobrizo era normal, pues el agua contiene iones de hierro y en el proceso de electrólisis los iones se pegan al metal. Id., pág. 18. Explicó que de haber un nivel bajo de agua esta flota, que es un dispositivo de seguridad, apaga automáticamente el quemador. Id., a la pág. 25.
Señaló que también existe el dispositivo de seguridad denominado columna de agua {''water column”) que opera independiente a la flota. Explicó que este sistema opera, a su vez con dos electrodos independientes, es decir que si falla un electrodo el otro activa el sistema, y que en caso de un nivel bajo de agua automáticamente se activa una alarma, se enciende una luz y se apaga el quemador. Id., a las págs. 26-27.
Sostuvo que el silbido que el señor Torres testificó que escuchó cuando fue a verificar la caldera era típico de la ruptura de un tubo y de la pérdida de agua gradual y no de una explosión violenta. Id., a la pág. 37. Manifestó que no tenía que haber agua en el homo pues existían drenajes en el piso. Id., a la pág. 38. Declaró que el color azuloso de los tubos no es exclusivo de un "dry-fire" pues también ocurre cuando existe poca transferencia de calor. Id., a la pág. 43.
También testificó que la American Association of Mechanical Engineers emite estándares, obligatorios en Puerto Rico sobre la dureza del agua que utilizan las calderas. Id., a la pág. 46. Además de esos estándares, sostuvo que es conveniente seguir los establecidos por el fabricante de la caldera. Explicó que de acuerdo al resultado de dureza del agua de cincuenta y seis (56) miligramos por litro obtenido por el ingeniero Guzmán, perito de Dye-Tex, el agua utilizada en la caldera era veintiocho (28) veces más dura que la recomendada. Id., a la pág. 51. Coincidió en que los daños que encontró en la caldera eran compatibles con haberla alimentado con agua que no estaba adecuadamente tratada. Id., a las págs. 53,114.
Declaró que no efectuó pruebas a la bomba de agua de la caldera. Id., a la pág. 68. Aceptó que en el interior de su tubería la caldera podría tener ochocientos (800) galones de agua. Id., a la pág. 70. Sostuvo que parte de esos galones de agua cayeron al homo y debieron salir por los drenajes del piso. Id. a las págs. 76-79. Añadió que según su experiencia, los operadores se percatan que hay un tubo roto al ver el agua corriendo. Id., a la pág. 80. Manifestó no haber visto marca de agua en el homo. Id., a la pág. 92.
Sostuvo que no es compatible lo testificado por el señor Torres, en tomo a que la presión de vapor de la caldera estaba descendiendo, con el hecho de que la caldera hubiese trabajado sin agua. Así mismo, testificó que tampoco era compatible que la presión de vapor de la caldera estuviera descendiendo, con lo señalado por el señor Fitzpatrick acerca de que observó en una fotografía que la aguja del instrumento medidor de la presión de vapor se había detenido en la marca de cien (100) libras. Explicó que esto resulta imposible puesto que la caldera operaba a cien (100) libras y esa medida la indica cuando está generando vapor. Id., a las págs. 158-159.
Por último, manifestó que la ausencia de rotura en los tubos del calderín de vapor le indica que la caldera no se quedó sin agua puesto que en dicha área es que comenzaría a contorsionarse la caldera. Id., a la pág. 159.
Ingeniero Francisco Cabán Vale, inspector de calderas (perito presentado por Royal Insurance)
*643 Declaró que examinó con un equipo los controles de seguridad de la caldera, la flota y la columna de agua y ambos estaban funcionando. Id., a la pág. 230-234. Testificó, además, que la flota no está hecha de acero inoxidable sino de cobre endurecido. Señaló que algunas ocasiones contiene dos y ‘ medio por ciento (21/2%) de cromo. Añadió que lo que es de acero inoxidable es la camisilla que la flota lleva alrededor, pero que cuando inspeccionó la caldera la flota no tenía dicha camisilla. Id., a las págs. 235-236.
Manifestó que las condiciones del homo eran deplorables y que el equipo estaba totalmente abandonado. Expresó que en éste había mucho fango y que todo el sistema para ablandar el agua estaba abandonado con sus válvulas inoperantes. Explicó que el sistema para ablandar el agua era uno de lavar en reversa ("backwash") que utiliza dos tanques conectados entre sí para el tratamiento del agua y que las palancas estaban totalmente trancadas e inoperantes. Id., a la pág. 237. Testificó que nunca había visto dentro de una caldera tantas escamas en su vida a pesar de haber visto miles de calderas y que tampoco había visto condiciones tan deplorables. Id., a la pág. 238.
Sostuvo que no comparte la opinión del señor Fitzpatrick referente a que la caldera sufrió daños debido a que se quedó sin agua. Explicó que no encontró prueba sobre ello puesto que siempre que en una caldera baja el agua las puntas de los tubos de arriba se sueltan y desaparecen. Señaló que ello ocurre pues el agua que queda cambia de su estado líquido a vapor y forma una onda expansiva de tal magnitud que todo desaparece. (Transcripción, vista de 2 de octubre de 1996, págs. 24-25,167,193.)
También expresó que el señor Fitzpatrick estaba equivocado al afirmar que el color azuloso de los tubos era indicativo de que habían estado expuestos a fuego sin contener agua. Explicó que esa decoloración denota un cambio en la estructura del metal producido por la pobre transferencia de calor como resultado de las escamas en el interior de los tubos. Id., a la pág. 26.
Testificó, también, que examinó con un equipo los controles de seguridad para el nivel del agua, la flota y la columna de agua y encontró que ambos estaban funcionando. Id., a las págs. 27-28, 30-31. Declaró, además, que examinó la camisilla que cubre la flota para ver si contenía depósitos que impidieran su funcionamiento y todo estaba limpio. Id., a la pág. 29
Manifestó que en el 1996, como parte del descubrimiento de prueba, realizó otra inspección en donde obtuvo dos pedazos de tubo y que al examinarlos encontró que estaban totalmente obstruidos por escamas. Id., a las págs. 43, 56-57. Señaló que dichas escamas- son causadas por el agua no estar tratada. Id., a la pág. 69. Con respecto al indicador de la presión de vapor, explicó que la única posibilidad para que quede fijo en cien (100) libras es que ocurra una explosión bien destructiva. Sostuvo que de cualquier otra forma el indicador desciende paulatinamente. Id., a las págs. 82, 84-85.
Se le mostraron varias fotografías de dicho indicador e identificó que marcaba cero (0) libras de presión en unas y entre sesenta (60) a ochenta (80) libras de presión en otra. Expresó que la única posibilidad para que esté marcando sesenta (60) u ochenta (80) en una fotografía tomada ocho meses después de los hechos era que alguien hubiese alterado el indicador. Id., a las págs. 82-84.
Sostuvo que el material de los tubos falló por la cantidad excesiva de escamas pues el calor se concentra en la pared de éstos hasta que se rompen. Id., a la pág. 87. Afirmó que lo ocurrido a la caldera no fue un accidente sino que fue producto del deterioro gradual debido a muchos años de falta de tratamiento al agua. Id., a la pág. 87.
Manifestó que fue contratado para averiguar lo sucedido en la caldera y que para ello no recibió instrucciones en ningún sentido. Id., a la pág. 104. Declaró que al romperse los tubos una parte del agua cayó en el homo, pero que casi toda debido a la alta temperatura se convierte en vapor y la que queda la absorbe la aislación o el drenaje en el piso. Id., a las págs. 144 145, 154, 180, 182. Expresó que a través de los agujeros de los tubos debían salir 4.16 pies cúbicos de agua por segundo mientras entraban a la caldera 3.4 pies cúbicos por segundo. Id., a las págs. 149-152.
Señaló que en el caso de un "dry-fire" al minuto comienza un raido inmenso y a los cuatro (4) minutos los tubos sé queman y desaparecen. Id., a la pág. 168-170. Testificó que durante una reunión *644 con el señor Fitzpatrick lo invitó a que le acompañara en su próxima inspección a la caldera y éste no aceptó. Id., a las págs. 189-190. Durante el examen de varias fotografías contestó que en ellas no se apreciaban vejigas en los tubos. Id., a la pág. 191. Manifestó que en las fotografías que tomó había dos (2) tubos que estaban bastante destapados, pero que el noventa y cinco porciento (95%) de los tubos estaban tapados. Id., a la pág. 198.
En el presente caso, en donde existe testimonio pericial conflictivo, el tribunal apelado estaba facultado para dirimir los conflictos de la prueba o hasta descartar la prueba pericial aunque ésta resultara técnicamente correcta. Véase lo resuelto en Prieto v. Maryland Casualty Co., 98 D.P.R. 594 (1970). El tribunal apelado estaba facultado para dirimir el conflicto entre los peritos y determinar cuál fue la causa del fallo de la caldera.
El tribunal apelado acogió la tesis pericial del señor Fitzpatrick y resolvió la controversia a favor de la parte apelada. Concluyó que la caldera súbita y accidentalmente dejó de producir vapor debido a que continuó encendida y generando calor sobre los tubos en el interior del homo sin contar éstos con agua suficiente. Analizada toda la prueba, respetamos esta determinación. Henríquez v. Consejo de Educación Superior, 120 D.P.R. 194, 210 (1987). El balance más racional, justiciero y jurídico de la evidencia que desfiló ante el foro de primera instancia, en específico la prueba pericial, demuestra que la causa del fallo de la caldera ocurrido el 10 de agosto de 1993 debió ser el resultado de un nivel bajo de agua. Nos llama poderosamente la atención que durante su testimonio el ingeniero Castillo sostuvo que, según su experiencia, en aquellos casos en que existe un tubo roto, sin existir un "dry-fire" o nivel bajo de agua, los operadores se percatan de ello al ver el agua corriendo. Esto no ocurrió en la situación ante nos. Ello, no empece a que fueron múltiples los tubos averiados y las perforaciones. Sin duda, de contener suficiente agua la caldera, a través de dichas perforaciones se debieron descargar cientos de galones de agua en el homo. Siendo así, no resulta factible, aun considerando que parte de esa cantidad sustancial de agua se evaporara, que no existiera en el homo el más mínimo rastro de su presencia. Específicamente sobre este punto, los dos peritos presentados por Royal Insurance declararon no haber visto marca alguna de la presencia de agua en el homo de la caldera. Debemos también señalar que, aunque existiese el alegado deterioro en la caldera en cuestión, dicha situación no impide la posibilidad de que ésta sufra daños producto de un accidente súbito e inesperado.
El foro de primera instancia apreció y adjudicó la credibilidad al dirimir las distintas declaraciones. Sus determinaciones están sostenidas por la prueba, según surge de la transcripción de los procedimientos y de la prueba documental admitida en el presente caso. No consideramos que dicho foro incidiera en la apreciación de la misma.
En virtud de todo lo anterior, se confirma la sentencia apelada.
El Juez Cordero emitió voto disidente por escrito.
Lo acordó y manda el Tribunal y lo certifica la Secretaria General.
Aida Ileana Oquendo Graulau
Secretaria General
*645 VOTO DISIDENTE DEL JUEZ DE APELACIONES SR. CORDERO — 99 DTA 7
San Juan, Puerto Rico, a 31 de agosto de 1998
Disiento de la opinión mayoritaria. En el caso de autos, no hay controversia en cuanto al hecho de que la caldera para producir vapor perteneciente a Dye-Tex Puerto Rico ("Dye-Tex") y asegurada por Royal Insurance ("Royal") sufrió una avería el día 10 de agosto de 1993. Como consecuencia de lo anterior, Dye-Tex se ha visto privada de utilizar dicha caldera, por lo que Dye-Tex le reclama a Royal la cantidad de $108,000.00. La controversia medular, la cual hay que determinar, se limita esencialmente al origen y causa del colapso de la caldera. Esto, dado a que la póliza expedida por Royal cubre todos los daños directos que sufra el equipo propiedad del asegurado causado por un accidente y no así los causados por deterioro o mal mantenimiento. Según la definición de la póliza, "accidente" es un daño que ocurre súbitamente y accidentalmente al objeto o en parte del objeto que, en el momento de su ocurrencia, tiene que manifestarse por sí mediante un daño real al "objeto". No se considerará accidente aquellos desperfectos que ocurran debido a: depauperación, deterioro, corrosión o erosión; desgaste por liso; filtraciones en cualquier válvula, junta, seíladores de eje.
Se ha reconocido en innumerables ocasiones la norma que establece que en el ejercicio de su facultad revisora, un foro apelativo se encuentra en iguales condiciones que el foro de primera instancia para evaluar la prueba pericial y documental y llegar a sus propias conclusiones. Díaz Ortiz v. FSE, 126 D.P.R. 32, 41 (1990), Ríos Ruiz v. Mark, 119 D.P.R. 816, 820 (1987), Cruz v. Centro Médico de P.R., 113 D.P.R. 719, 721 (1983), Zambrana v. Hospital Santo Asilo de Damas, 109 D.P.R. 517, 522 (1980).
En Abudo Servera v. A.T.P.R., 105 D.P.R. 728 (1977), el Tribunal Supremo de Puerto Rico expresó ala página 731:

"...aunque haya evidencia que las sostenga, las conclusiones de hecho de un Tribunal de anterior instancia se consideran claramente erróneas, si del examen de la totalidad de la evidencia el Tribunal de revisión queda definitiva y firmemente convencido que un error ha sido cometido, como es el caso en que las conclusiones de hecho están en conflicto con el balance más racional, justiciero y jurídico de la totalidad de la evidencia recibida."

Igualmente, el Tribunal Supremo de Puerto Rico ha reconocido que "[e]l arbitrio del juzgador de hechos es respetable, más no es absoluto. Una apreciación errónea de la prueba no tiene credenciales de inmunidad frente a la función revisora de este Tribunal." Vda. de Morales v. De Jesús Toro, 107 D.P.R. 826, 829 (1978), Méndez de Rodríguez v. Morales Molina, _ D.P.R _ (15 de noviembre de 1996), 96 J.T.S. 149, pág. 347.
Una lectura de la Transcripción de Evidencia presentada en este caso demuestra claramente que el Tribunal de Primera Instancia acogió la opinión ofrecida por James Fitzpatrick, un supuesto perito hallado en Estados Unidos, descartando por completo las opiniones vertidas por los ingenieros Cabán y Castillo, ambos expertos en la inspección de calderas, y quienes examinaron la caldera en un tiempo más cercano a los hechos.
El Sr. James Fitzpatrick, quien no posee licencia de ingeniero en ninguno de los cincuenta (50) estados de Estados Unidos, examinó la caldera el 18 de abril de 1994, esto es ocho (8) meses después de los hechos. Su involucración con calderas se ha basado más bien en la fase de reparación o reacondicionamiento. No ha realizado estudios formales ni tiene créditos en metalurgia.
Este perito declaró, en síntesis, que en su opinión los daños de la caldera fueron producto de un *646 "dry fire", es decir, que la caldera dejó de recibir agua mientras el homo seguía operando. Sin embargo, es importante destacar que el propio señor Fitzpatrick declaró que la condición de falta de agua la pudo diagnosticar de ver la caldera en un minuto, sin entrevistar testigos ni observar récords de mantenimiento y más importante aun, sin ver pmebas de laboratorio sobre la calidad del agua de alimentación de la caldera.
Por otro lado, Royal presentó a los peritos ingenieros Cabán y Castillo. El señor Castillo es ingeniero mecánico desde el año 1949. En ese mismo año fue certificado por el Departamento del Trabajo como inspector autorizado de calderas. Trabajó los primeros veinte (20) años de su profesión en la Puerto Rico Iron Works donde participó en la fabricación de los primeros tanques de presión, de acuerdo con la "American Society for Mechanical Engineers". En el 1969, comenzó a trabajar en Union Carbide. Allí su puesto consistía en la supervisión del mantenimiento preventivo, reparaciones e instalaciones de equipo nuevo, entre los que se encontraban calderas de más de 100,000 libras por hora. Además, trabajó en la Autoridad de Energía Eléctrica. Su función en esta corporación era determinar la condición de calderas para que éstas fueran certificadas. También trabajó en la Puerto Rican Cement y la Commonwealth Oil Co. (CORCO), como inspector de todo equipo de presión, incluyendo calderas. Recientemente, trabajó en la Warner Lambert donde reparó varias calderas averiadas. En resumen, el ingeniero Castillo lleva sobre cuarenta (40) años envuelto en aspectos de evaluación, inspección, construcción y reparación de calderas. Es preciso enfatizar que el ingeniero Castillo fue inicialmente contratado por Dye-Tex, sin embargo, esta compañía no estuvo de acuerdo con sus hallazgos, por lo que decidió no presentarlo como perito y luego buscó al señor Fitzpatrick en los Estados Unidos para que éste testificara como perito en calderas.
Por su parte, el señor Cabán es ingeniero mecánico desde el 1967. El primer año de su profesión trabajó en la Autoridad Energía Eléctrica. Allí su puesto consistía en diseñar para la reparación de calderas. Luego se trasladó a Nueva York a trabajar en Hartford Steam Boiler como inspector de calderas. En el 1969, tomó y aprobó el examen de inspector de calderas de la "American Society of Mechanical Engineers", entidad que regula la licenciatura de inspector de calderas para todos los estados de la Unión. Además, obtuvo un entrenamiento de investigación de pérdidas causadas por calderas en Norwood, Massachusetts. En Atlanta trabajó en "Boiler & Machinery" donde también inspeccionaba calderas. Actualmente, está a cargo de la inspección de calderas de prácticamente el noventa porciento (90%) de las farmacéuticas, entre las cuales se encuentran la U. S. Surgical Corporation, Abbott, Up-íohn, Sterling, Merck Sharp & Dohme, Johnson & Johnson y Baxter.
Tanto el ingeniero Cabán como el ingeniero Castillo declararon, en síntesis, que los daños de la caldera de Dye-Tex fueron ocasionados por el deficiente tratamiento del agua utilizada para alimentar la caldera. Expresaron que el tratamiento que Dye-Tex le daba al agua de la caldera era uno deficiente, teniendo el agua una dureza de más de cinco (5) veces del nivel de sólidos recomendado. Esto ocasionó que se fueran formando capas de escamas gruesas en el interior de los tubos que, al irse acumulando, crearon aislación mayor entre el calor extemo que reciben los tubos y el agua que corre por los mismos, sobrecalentándose éstos y finalmente provocando la falla de los mismos.
La opinión mayoritaria hace énfasis en el hecho de que los operadores no observaron agua saliendo de la caldera al momento del colapso o avería de la caldera. Sin embargo, tanto el ingeniero Cabán como el ingeniero Castillo explicaron que el agua que salía por las perforaciones, al caer en la zona de radiación, se evaporaba casi toda, y la que no, salía por los drenajes que tiene la caldera o la absorbía la aislación.
En la sentencia dictada por el Tribunal de Primera Instancia se catalogó como un testimonio no controvertido el vertido por el Sr. Félix Torres, gerente de la planta. El señor Félix Torres atestiguó que la aguja del instrumento que mide el vapor en el interior de la caldera estaba descendiendo. Sin embargo, lo anterior no es compatible con el testimonio del señor Fitzpatrick, ya que éste testificó que, según fotografías tomadas en abril de 1994, el medidor de la presión de vapor se había detenido en una presión de cien (100) libras y que ello era característico de un nivel de agua bajo. En cuanto a este aspecto, el ingeniero Castillo explicó que era imposible que la aguja indicara una presión de cien (100) libras en abril de 1994. Expresó que para que el medidor de la presión marque cien (100) libras, la caldera debe de estar generando calor. Por su parte, el ingeniero Cabán explicó que la única manera en que el medidor puede quedarse fijo en cien (100) libras es que ocurra una explosión destructiva, la *647 cual no ocurrió en el presente caso. Sostuvo que de cualquier otra forma el indicador desciende paulatinamente. Al mostrársele varias fotografías de dicho medidor, las cuales mostraban el indicador en cero (0) libras de presión y otras entre sesenta (60) a ochenta (80), expresó que solamente alterando el indicador se podía obtener la marca entre ochenta (80) y sesenta (60) libras de presión ocho (8) meses después de los hechos.
En las Determinaciones de Hechos Núm. 20, subsecciones de "A" a "J", el Tribunal de Primera Instancia hace un recuento de los hallazgos supuestamente compatibles con daños causados por "dry fire”. Tales hallazgos no son característicos o exclusivos del mismo. Más aun, varias características coinciden con los hallazgos de los peritos de Royal, aunque difieren en su explicación sobre lo que produjo los mismos. Ejemplo de lo anterior lo es la característica de coloración azul que se encontró en algunos tubos. Tanto el ingeniero Gabán como el ingeniero Castillo aseguraron que el color se debía a la pobre transferencia de calor por la insulación que causa la escama sobre los tubos. Se especificó que la decoloración denotó un cambio en la estructura del metal debido a la cantidad de escamas que se encontró dentro de los tubos que no permitió la transferencia de calor a través de la pared hacia el agua. Además, se explicó que la escama convierte en nula la transferencia de calor porque es refractoria, haciendo que la temperatura de los tubos suba más allá de lo estipulado, lo que ocasionó que el material se dañase y cambiase de color. Esta explicación fue descartada erróneamente por el Tribunal de Primera Instancia a pesar de que el propio perito de Dye-Tex, el señor Fitzpatrick, atestiguo que vió la presencia de escamas dentro de los tubos de la caldera.
Por otra parte, la especulación a la cual llegó el tribunal a quo, a los efectos de "...que con mayor probabilidad luego de ocurrir la interrupción eléctrica, la bomba de agua que funcionaba mediante electricidad dejó de bombear agua para alimentar la caldera”, es insostenible. No hubo prueba alguna que demostrara que como consecuencia de tal interrupción, la bomba dejara de funcionar. Por el contrario, se probó que los dos mecanismos de seguridad de la caldera, los cuales envían una señal automática para que se apague el fuego de la caldera, estaban funcionando.
En Díaz Ortiz v. FSE, supra, págs. 40-41, el Tribunal Supremo de Puerto Rico expresó que no sostendrá una decisión basada en prueba pericial vaga, superficial e imprecisa y que rechazará toda prueba que equivalga a especulación o conjetura basada en hechos subsidiarios que no sostengan adecuadamente las conclusiones a las cuales llegan. Enfatizó, además, que no se puede sostener una decisión fundamentada en prueba pericial, imprecisa y vaga por analogía, y al contrario, si se presenta pmeba pericial precisa, clara y contundente, es necesario resolver de acuerdo con ésta.
A la luz de lo anteriormente expuesto, estoy convencido de que la determinación a la cual llegó el Tribunal de Primera Instancia en cuanto a que la causa de los daños sufridos por la caldera fue un accidente al dejar de recibir ésta el suministro de agua que necesitaba, no representa el balance más racional, justiciero y jurídico de la totalidad de la evidencia que desfiló ante el Tribunal de Primera Instancia y por lo tanto, la misma no debe prevalecer.
CHARLES A. CORDERO
Juez de Apelaciones